JETPAC GROUP, LTD.

v.

BOSTEK, INC.

Civil Action No. 94–12218–GAO.

United States District Court,
D. Massachusetts.

Sept. 27, 1996.

Steven E. Soileau, Mayer, Smith & Roberts, Shreveport, LA, CharCretia DiBartolo,

Cetrulo & Capone, Boston, MA, for Jetpac Group, Ltd.

Lawrence W. Pettiette, Jr., Blanchard, Walker, Oquin & Roberts, Shreveport, LA, Edward D. McDonald, Donovan & McDonald, Braintree, MA, A. Russell Lucid, Braintree, MA, for Bostek Inc.

### FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER FOR JUDGMENT

O'TOOLE, District Judge.

The plaintiff, Jetpac Group, Ltd., a Louisiana corporation based in Shreveport, Louisiana ("Jetpac"), seeks damages from the defendant, Bostek, Inc., a Massachusetts corporation with its place of business at Hanover, Massachusetts ("Bostek"), that it says were caused by Bostek's having sold defective computers to Jetpac. The complaint sets forth claims for breach of contract and violation of the Massachusetts statute prohibiting unfair or deceptive trade acts or practices, Mass.Gen.L. ch. 93A, § 1 et seq.[1] This Court's jurisdiction is founded upon the parties' diversity of citizenship. 28 U.S.C. § 1332.

The matter was tried to the Court sitting without a jury. Pursuant to Fed.R.Civ.P. 52(a), the Court herein sets forth its findings of fact, conclusions of law, and order for judgment.

### I. FINDINGS OF FACT

Jetpac is an export/import trading company formed in 1988. Its business generally involves selling food products, such as frozen chicken, in various countries around the world, including Russia. In the years 1989 through 1992, Jetpac shipped about $17 million worth of food products to Russia. In April, 1992, Jetpac's president, James Duke, saw an advertisement that had been placed in the *Journal of Commerce* by a company in Montreal, Canada, called Natashquan Korotia Systems ("NKS"), seeking a supplier of computers for a Russian customer of NKS. At the time, shortly after the breakup of the Soviet Union, many people were trying to take advantage of the "opening up" of business opportunities in Russia. There was a particularly "hot" market in personal computers, so much so that an especially desired configuration actually acquired a common nickname: "Russian 286's." In the heated market, demand often outstripped supply. NKS had a customer in Russia that was interested in buying Russian 286's. That was the reason for NKS's advertisement in the *Journal of Commerce;* it had a customer, but it needed a source of computers.

Duke responded to the advertisement and as a result met NKS's president, Nowshade Kabir. Kabir, a Canadian citizen, originally hailed from what had been the Soviet Republic of Georgia and was experienced in doing business in Russia. In 1992, NKS sold approximately $4 to $5 million worth of computers within Russia. Duke and Kabir discussed an arrangement whereby Jetpac would supply several hundred Russian 286's that NKS would sell to its customer. Kabir told Duke that NKS had the opportunity to sell between 3,000 and 5,000 computers to its customer. In about May, NKS entered into a written contract with the Russian buyer for 3,000 "Russian 286's" at a price of $1,050 each. (Ex. P–44.) The customer was a cooperative named "Harmony."

Jetpac had never sold computers before, but it had recently hired a person, Al Konrad, who had been involved in computer systems trading since 1978. Duke assigned Konrad the task of locating computers that could meet the business opportunity presented by NKS. Konrad began to look to arrange a "test" shipment of about 100 computers. In early June, 1992, he contacted CNS Trading, Incorporated of Norwell, Massachusetts ("CNS"), a broker that obtained a quote from Bostek for personal computers meeting Konrad's specifications.

Bostek is a supplier of computer hardware, software, and consulting services. Among other things, it builds integrated systems to customers' specifications, buying the components from various sources, assembling the

---

1. Bostek had counterclaimed for malicious prosecution and abuse of process, but it waived those counterclaims prior to trial.

system, and then reselling it. On June 9 and 10, 1992, CNS relayed to Konrad Bostek's price quote of $605 per unit for a minimum of 1,000 systems, meeting Konrad's specifications, plus shipping charges. CNS also sent some information about Bostek. (Exs. P–3, P–4.)

Konrad flew to Boston on June 11, 1992, to visit the Bostek facility in Hanover. He wanted to assure himself that Bostek would be a suitable supplier of the large number of systems that Jetpac was contemplating buying and then, with NKS, reselling in Russia. Konrad met Mark Hanson, Bostek's president. Konrad described to Hanson that he was interested in finding a source for "Russian 286's" and that Jetpac expected to be able to sell between 3,000 and 5,000 systems in Russia. He did not identify either NKS or the anticipated customer in Russia, because he did not want Bostek and NKS to deal directly with each other, thus leaving Jetpac out of the business opportunity. Hanson also gave Konrad some literature about Bostek (Ex. P–1) and gave him a tour of the Hanover facility. Konrad ran a test on a system similar to the one he wanted to buy and was satisfied with its performance.

Hanson assured Konrad that Bostek could build between 100 and 200 systems per day if given five to ten days notice. Konrad told Hanson that while Jetpac was looking to buy perhaps 3,000 to 5,000 systems over time, it wanted to make a test shipment of 100 computers to its Russian customer the following Monday, June 15. For this smaller number of computers, Bostek's price was $630 per unit, rather than $605 per unit for the larger quantity. Hanson indicated that Bostek could build 100 systems for shipment on Monday, June 15, but that they might have to be assembled in California. Bostek's literature contained a reference to "Bostek's worldwide presence with offices in Boston, Los Angeles, Calgary–Canada and London–England." (Ex. P–1 at 1.)

The parties agreed on the terms for the 100 computers, and Bostek issued to Jetpac an invoice dated June 11, 1992, reflecting those terms. (Ex. P–6.) The invoice described the systems to be sold as follows:

BOSTEK 286/16 MOTHERBOARD
CONSISTING OF: DESKTOP CASE & 220 VOLT POWER SUPPLY, 40MB HARD DRIVE IDE,
1.2 & 1.44 FLOPPY DRIVES, 2 SER, 1 PAR, HARD FLOPPY CONTROLLER, 1MB RAM, VGA CARD W/256K
VGA MONITOR .39, 800X600 CAPABLE, MOUSE 3 BUTTON SERIAL, M.S. COMPATIBLE
287 MATH CO PRO, 101 CYRILLIC/ENGLISH KEYBOARD NEW, CONFIGURED, TESTED, IN SHIPPING BOX FOB BOSTON

The price for the 100 systems was $63,000, and on June 12, Jetpac wired Bostek that amount.[2] The units were to be shipped directly to the customer in Russia. Jetpac was to pay the freight costs for shipping from Boston, which would amount to $8,184.

Bostek was unable to assemble the systems in Hanover, and Hanson flew to California over the weekend to try to find systems to fill the order. Despite what one might have concluded from Bostek's literature, Bostek had no physical office or facility in California. Rather, it had a California representative who worked out of his home.[3] After some searching, Hanson found a supplier, American Computer Systems ("ACS"), to provide the systems to fill Jetpac's order. Hanson did not tell Jetpac that Bostek was not assembling the systems but that they were rather being assembled by ACS. Hanson did not test any of the systems. He relied on ACS to have properly assembled the systems.

There was a delay in making the shipment, and the goods were not shipped until Thursday, June 18. The delay was partly due to Hanson's search for computers to fill the order, and it was partly due to a dispute between Bostek and Jetpac over which one should be responsible for the increased

---

**2.** Jetpac billed NKS and was paid by NKS by wired funds as well.

**3.** Hanson defended the statement in the literature by saying that Bostek maintained a "virtual office" in California through the presence of its representative there.

freight costs occasioned by the shipment from California rather than Boston, as originally agreed. Hanson had earlier agreed that Bostek would pay any difference in shipping costs, but he balked when the occasion actually arose, and Jetpac eventually paid freight charges that were $2,781.20 more that previously contemplated.

When the computers arrived in Russia, the customer notified NKS that there were significant problems. Not all the specified components were included. For example, no "mice" were shipped, though the specifications called for them, and there was no documentation for the major components. In addition, some of the wiring in the central processing unit was either missing or disconnected. Further, the monitors did not switch automatically from 110 to 220 volts, and as a result several of them "blew up" when they were initially switched on. Hanson had to send specific instructions about how to perform an internal adjustment on each monitor to permit it to operate with 220 volt electric current. (Ex. P–14.)

When the problems with the shipment appeared, Duke was in Europe on other business. He went to Moscow and met with the very dissatisfied customer. He also examined some of the computers and personally observed the problem of improper wiring. He tried to turn on five separate systems that had been in the shipment, only one of which "booted up."

In short, the "test shipment," designed to impress the new Russian customer and open the way to more sales, was a disaster. In an effort to convince the Russians that they could in fact fulfill its contract to supply specified computers, NKS and Jetpac bought an additional 200 computers and shipped them to the Harmony cooperative. Nonetheless, Harmony was still dissatisfied because of the problems with the first 100 computers supplied by Bostek. It refused to pay NKS fully for that first shipment, and NKS charged back to Jetpac its share of the shortfall, or $23,517.

In addition, as a direct consequence of the failure of the shipment to conform in significant material respects to the specifications given by Jetpac to Bostek, Harmony refused to buy the balance of the 3,000 systems called for by its agreement with NKS. Thus, reasonably probable sales of an additional 2,700 computers at the price of $1,050 each were lost, along with such profit as Jetpac would have earned if it had acted with NKS to fulfill the Russian order for those computers, as agreed between Jetpac and NKS.

The price in the contract between NKS and the Russian customer included a printer. Jetpac's agreement was to produce all the components of a system *except* the printer. The reason apparently was that printers suitable to the Russian market were difficult to obtain in the United States and relatively easy to obtain in Russia. NKS planned to acquire the printers in Russia and combine them there with the systems procured by Jetpac. According to Kabir, who had experience purchasing such printers in 1992, suitable printers could be purchased for about $235 per unit.

The cost of the systems sold to the Russian buyer was thus the total of the cost of the system procured by Jetpac, the cost of the printer, and the necessary shipping costs. Each of these costs would vary somewhat at different times and under different circumstances. For example, Jetpac paid Bostek $630 per unit for the shipment of 100 systems, but Bostek had quoted $605 per unit if Jetpac ordered a minimum of 1,000 systems. Similarly, the freight costs per unit for shipment from Boston had been quoted at $81.84, but the actual cost per unit for the shipment from California had been $111.65.

Taking these facts into account, it is possible to approximate the cost of systems to be sold under the NKS–Harmony contract as follows: First, a unit price of $605 for large quantities seems appropriate as a starting point, and it is not unfair to use the price Bostek itself quoted. Second, since it cannot be determined where all the systems would be shipped from and since the shipping point apparently has an effect on the costs, it seems appropriate to estimate shipping costs at about $100 per unit, that is, in the middle of the range of shipping costs disclosed by the evidence. Finally, there was no evidence other than Kabir's about the cost of Russian

printers, so it is appropriate to use that evidence to establish this cost element at $235 per unit. The total of these costs is $940. Given the contract sale price of $1,050, the profit on each unit would be $110. That figure is consistent with Kabir's estimate of a per unit profit in the range of $100 to $115.[4] Because Jetpac and NKS had agreed to split the profits evenly, Jetpac's unit profit would have been about $55. For the 2,700 computers not sold under the NKS–Harmony contract because of the defects in the "test shipment," Jetpac's profit would have been $148,500.

Jetpac incurred other expenses as a direct result of the defects in the computers sold to it by Bostek. Duke incurred travel expenses of $3,997.13 in going to Moscow to try personally to mollify the unhappy customer. (See Exs. P–48, P–49.) And, as noted, Jetpac incurred shipping expenses of $2,781.20 more than it had agreed with Bostek.

## II. CONCLUSIONS OF LAW

Jetpac and Bostek entered into a valid and binding contract for the sale of 100 computers conforming to the specifications set forth in the Bostek invoice of June 11, 1992. The contract was one for the sale of goods, and the implied warranty of merchantability imposed under the Uniform Commercial Code ("U.C.C.") applied. Mass.Gen.L. ch. 106, § 2–314.

■ Bostek committed a breach of the contract by failing to furnish goods that conformed to the contract description. In addition, the goods furnished were defective, in breach of the warranty of merchantability.

■ For the breach of contract Jetpac is entitled to damages in the amount of any loss that resulted "in the ordinary course of events from the seller's breach as determined in any manner which is reasonable." Mass.Gen.L. ch. 106, § 2–714(1). For breach of the warranty, Jetpac is entitled to damages in the amount of the difference "between the value of the goods accepted and the value they would have had if they had been as warranted." *Id.* at § 2–714(2). In both cases, the damages can be determined by Jetpac's share of the loss incurred by NKS when the customer in Russia refused to pay the full price for the goods. Jetpac's share, as described above, was $23,517.

■ In addition, "[i]n a proper case any incidental and consequential damages under [§ 2–715] may also be recovered." *Id.* at § 2–714(3); *see Hendricks & Assocs. v. Daewoo Corp.,* 923 F.2d 209, 213 (1st Cir.1991). Under § 2–715, recoverable consequential damages include "any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise." Mass.Gen.L. ch. 106, § 2–715(2)(a). Such damages include "prospective profits lost as the natural, primary and probable consequence of the breach." *Hendricks,* 923 F.2d at 214 (internal quotation marks and citations omitted).

■ In this case, Konrad had told Hanson at Bostek that the shipment of 100 computers was only the initial one in a prospective sale of 3,000 units to the buyer in Russia. Bostek thus had reason to know that a defective shipment could jeopardize that business opportunity and bring about a loss of the profits that could reasonably be earned if the full 3,000 units were to be shipped. To be sure, there was no assurance that for some other unforeseen reason the full 3,000 would not ultimately be sold. There was a firm contract for that number, however, and it is a reasonable inference that if the initial shipment had conformed to the contract specifications and the warranty of merchantability, the contract would have been fulfilled. Damages cannot be assessed upon conjecture or surmise, *Hendricks,* 923 F.2d at 217, but by the same token the reasonable prospect of damages—such as is shown by the existence of NKS's contract with the Russian buyer—should not be defeated by conjecture or surmise, either. The plaintiff's burden is not to demonstrate its damages with mathematical

---

**4.** Duke estimated that Jetpac and NKS would each net a profit of about $100, but he did not elaborate on his method for calculating that figure. Considering all the evidence, his estimate seems too high.

certainty but only to a "fair degree of certainty." *Hendricks*, 923 F.2d at 217 (internal quotation marks and citations omitted). The calculation of lost profits set forth above meets that test.

Jetpac is also entitled under § 2–715(1) to incidental damages, which include the increased shipping costs and the cost of Duke's trip to Moscow to try to solve the problem caused by the defective goods and thus to mitigate potential damages.

Accordingly, on its claim of breach of contract, Jetpac is entitled to damages for the direct loss in the transaction in the sum of $23,517, for consequential damages for lost prospective profits in the sum of $148,500, and for incidental damages in the sum of $6,778.33, for a total of $178,795.33.

■ Contrary to Jetpac's other claim, the events described do not make out a violation of Mass.Gen.L. ch. 93A, §§ 2, 11. Every breach of contract does not amount to an unfair or deceptive act or practice. In this commercial context, the breach of the warranty of merchantability does not automatically amount to an unfair or deceptive trade practice, as it would in a consumer context. *See* Mass.Regs.Code tit. 940, § 3.08(2); *Knapp Shoes, Inc. v. Sylvania Shoe Mfg. Corp.*, 418 Mass. 737, 640 N.E.2d 1101, 1105–1106 (1994). As dramatic and unmistakable as the breach was in this case, there is no evidence of any intentional or fraudulent acts by Bostek. Beyond the breach itself, Bostek's performance was not otherwise either unfair or deceptive.[5]

---

**5.** Jetpac claims that Bostek was deceptive in suggesting that it had a California facility similar to the one Konrad had toured in Hanover and in failing to tell Jetpac that it (Bostek) had not filled Jetpac's order by building the computer systems directly but by obtaining them already built from ACS. As to the first point, Bostek did perhaps exaggerate a bit in describing the representative working out of his home as a Los Angeles "office," permitting Jetpac to imagine something more concrete and established than what actually existed. But while the evidence shows that Konrad wanted to tour the Bostek facility to assure himself of the quality control at the place where the systems were to be assembled, it does not indicate that he communicated his concerns so clearly to Bostek that the place of assembly became a part of the bargain or that Bostek

## III. ORDER FOR JUDGMENT

For the reasons set forth above, judgment shall be entered in favor of the plaintiff and against the defendant, awarding damages in the sum of $178,795.33, together with applicable interest and costs.

It is SO ORDERED.

should have known that it was material to Jetpac's interest in going forward with the transaction.

As to the second point, in context it was not deceptive for Bostek to get computers from another source without telling Jetpac. The whole business environment, understood well by all participants, was one of brokers and traders and agents acting variously for undisclosed or partially disclosed principals. Without a specific prohibition against "subbing out" the assembly of the systems, and there was none, it should not be inferred that that practice was a devious or unfair one. Konrad did want to be sure that the systems bore a Bostek label, but that was principally so that the customer could see that the systems had been assembled in America.