In The



Court of Appeals



Ninth District of Texas at Beaumont


____________________



NO. 09-06-439 CV


____________________



MORGAN BUILDINGS AND SPAS, INC., Appellant



V.



HUMANE SOCIETY OF SOUTHEAST TEXAS, Appellee






On Appeal from the County Court at Law No. 1


Jefferson County, Texas


Trial Cause No. 100569 






OPINION



 Morgan Buildings and Spas, Inc. appeals a judgment in favor of the Humane Society
of Southeast Texas based on breach of contract, breach of warranty, fraud, and violations of
the Texas Deceptive Trade Practices Act (DTPA). We conclude Morgan breached the
contract, but there is insufficient evidence of the amount of damages, and the recoverable
attorney fees were not segregated from non-recoverable fees. We conclude the DTPA, fraud,
and warranty claims have no merit. The judgment is reversed and the cause is remanded for
a new trial on the contract claim.

The Sale


 The dispute arose from the purchase of a Morgan steel frame building. Cynthia
Meyers, the former board president of the Humane Society of Southeast Texas, went to
Morgan and identified a carport. Carey Sonnier, a Morgan assistant branch manager,
approached Meyers and offered assistance. Meyers told Sonnier the Humane Society wanted
to buy a building in which to store animal food and lawn equipment, and she told him the
carport would be ideal if Morgan could add sides, a front and back, and double doors on both
ends. She also told Sonnier that the Humane Society planned to install its pre-existing
shelves inside against the walls. 

 Meyers told Sonnier the building needed to be secure. She wanted to prevent rodents
from entering the building. Sonnier told her Morgan could add sides and doors, making the
building secure. Morgan had a special insulation "to make sure that nothing could get into
the building. [H]e said there was a certain way that the slab would be built to secure it so that
rodents couldn't enter the building under the metal." Sonnier told her the slab should be built
with a "rat lip." 

 After obtaining funding, Meyers returned to Morgan and told Sonnier the Humane
Society was ready to buy the building. The building would have almond-colored sides with
a green top and green trim. Meyers reiterated the Humane Society's other requests from the
first meeting. Meyers testified that, by writing the check for the down payment, she "was
relying on Morgan Buildings and their sales person to satisfy the needs that we had stated,
and he said he could satisfy." (1) The price of the building was $4,495. 

The Written Purchase Agreement


 The purchase agreement provided that the Humane Society agreed to purchase, and
Morgan agreed to "manufacture, deliver and erect," a steel frame building. The nominal
"eave height" was listed as "6." In Sonnier's handwriting, the "comments and
specifications" section of the purchase agreement described the structure as: "14 x 32 x 6'
SFB (4-WALL) W/DBL SWING OPEN CUSTOM DOORS ON BOTH 14' ENDS. 
ALMOND W/GREEN TRIM AND GREEN ROOF. * CUST. SLAB NEEDS TO BE 13' 9"
x 31' *." (2) A sketch below this description depicted the width and length of the building. The
actual width was to be 13' 9", and the actual length was to be 31'. 

 Above the signature line, the contract stated in larger uppercase letters: "read both
sides before signing[.]" Below that statement, the agreement provided:

 I acknowledge that the additional terms and conditions printed below and on
the back of this agreement are agreed to as part of this agreement the same as
if printed above my signature. By signing below, I am agreeing to purchase
the described product, together with the optional equipment and accessories
described hereon. This agreement contains the entire understanding between
you and Morgan and no other representation or inducement, verbal or written,
has been made which is not written hereon. 


At the bottom of the first page of the contract was a second statement that the reverse side
of the contract was part of the agreement. The contract contained a provision in larger bold
uppercase letters, disclaiming express or implied warranties, and any incidental or
consequential damages.

 The purchase agreement disclaimed the authority of any agent, employee, or
representative to bind Morgan to any affirmations, representations, or warranties not
contained in the agreement. A merger and integration clause stated that the contract
contained the entire agreement of the parties, there were no other promises, agreements, or
warranties, and all previous contracts, offers, solicitations, bids, proposals, or
communications were superseded unless expressly incorporated in the contract. (3) Any
modifications had to be in writing and were only binding if signed by all the parties to the
contract. 

 On the date Meyers signed the purchase agreement, Meyers and Sonnier both signed
a document entitled "Clear Span Steel Buildings Specifications and Drawing" that referenced
the purchase agreement. The specifications indicated that the Humane Society was to
provide the slab, and Morgan was to supply a base rail and install a 13'9" x 31' building with
almond-colored siding and green roof and trim. The wall height was described as "6 foot." 

The Delivery


 Morgan delivered a steel frame structure and completed its construction. Meyers
explained that when she saw the building, "the sides were the wrong color, the roof was
brought down all the way on the sides. There was no sides. It was roof all the way from the
tiptop to the ground." Meyers testified the metal on the north and south sides of the building
was very rusted, the doors fit poorly, the locks did not work, the door on the south side of the
building did not have a heavy-duty steel frame around it, the insulation was not present, there
were gaps under the door and between the wall and the ceiling, there were holes in the roof
where the builders had "missed" the rafter and had instead drilled into the roof, portions of
the metal did not meet properly, and the building was the wrong color. 

 Meyers explained that the building was too short, and it contained internal bracing,
which made it impossible to store anything over four-and-a-half feet tall against the walls on
either side. The building she selected during her visit to Morgan did not contain this bracing. 
Meyers testified the Humane Society's shelving would not "even come close to fitting"
inside the building Morgan provided because there are only about four-and-a-half feet on the
side of the building before the internal bracing begins, and the building contains "bracing
every 4 feet . . . that was not on the original carport that we looked at there at Morgan
Buildings." 

 Because the building Morgan provided was not secure, the Humane Society could not
store its lawn mower and lawn equipment in the building. The Humane Society ultimately
purchased another building for $4,300, and eventually paid $5,500 to convert its cat patio
into a food storage room. It attempted to store animal food in the Morgan building, but had
to discard approximately one hundred bags of food due to rodent infestation. According to
Meyers, the Morgan building has zero market value for storing animal food and the Humane
Society could not store lawn equipment in the building. 

 Meyers immediately called Sonnier and told him the building Morgan installed was
not the building the Humane Society ordered. Sonnier came to the Humane Society and
assured Meyers "that everything would be fixed and would be made right, that they would
come back and fix it."

 Meyers explained that Morgan cut the roof off so that sides could be put on the
building, corrected the color by placing almond-colored sides on the building, and replaced
the metal on the rusty doors. According to Meyers, there was a one to two-inch gap
underneath the doors, allowing rodents to enter the building. The sides of the building did
not fit properly onto the "rat lip" of the slab, and Morgan never installed heavy-duty metal
for the locking mechanism. 

 Sonnier testified that he was the salesperson who assisted the Humane Society. He
sold the Humane Society a steel frame carport. Sonnier discussed with Meyers the Humane
Society's concerns regarding infiltration by weather and pests, and Sonnier knew the building
was to be used to store animal food. Sonnier testified that part of the agreement with Meyers
was for the building to be weatherproof. He did not tell Meyers the building would be rodent
proof or rodent resistant. The Humane Society had budgetary constraints. Morgan provided
a building with six-foot walls instead of eight-foot walls because of those constraints. 
Sonnier testified the building Meyers saw at Morgan and the building Morgan installed at the
Humane Society are different, because the one is a carport, and the other is a four-walled
structure. 

 Paul Morrell, Morgan's operations manager, visited the building site several times.
The third time Morrell went to the site, he discovered that the metal had been cut too short
and did not reach the slab, the building was not watertight, and parts were missing from the
building. He saw light coming in from the top of the building. He replaced the metal that
was cut too short. 

 Morrell explained that a "Clear-Span building is a building that has no center
supports, like a pole." Morrell also testified that some of Morgan's carports do not require
diagonal braces along each side, and that carports can be converted into buildings.

The Findings, Conclusions, and Judgment

 The trial court made findings of fact and conclusions of law on the causes of actions
asserted by the Humane Society. The court ordered Morgan to pay the Humane Society 
$4,495 for the cost of the Morgan building, $1,000 for the cost of lost animal food, $4,300
for the cost of the replacement building purchased to store the lawn equipment, $5,500 for
the cost of remodeling existing structures to store animal food, statutory damages of $2,000,
and attorney fees of $20,000 through trial, $11,000 should the case be appealed to the court
of appeals, and $5,000 should the case be appealed to the Supreme Court.

Breach of Contract


 Morgan's first issue asserts the trial court erred in finding Morgan breached the
contract. Morgan argues the written purchase agreement represents the parties' complete,
integrated contract, and any orally-agreed requirements for the structure are unenforceable. 
Morgan says it agreed to sell a 14' by 32' steel frame building with walls that were six feet
high and double swing-open doors at both ends, and that is the building it delivered and
installed. 

 An agreement is integrated if the parties intended a writing to be a final and complete
expression of agreed terms. ISG State Operations, Inc. v. Nat'l Heritage Ins. Co., 234
S.W.3d 711, 719 n.10 (Tex. App.--Eastland 2007, pet. denied). A fully integrated written
agreement is a final and complete expression of all the terms agreed upon by the parties. Id. 
A partially integrated agreement is a final and complete expression of all the terms addressed
in that written agreement, but is not a final and complete expression of all the terms the
parties have agreed upon. Id. A court considers the surrounding circumstances in
determining whether, and to what degree, an agreement is integrated. See generally Sun Oil
Co. (Del.) v. Madeley, 626 S.W.2d 726, 731-32 (Tex. 1981) (explaining that surrounding
circumstances are considered in determining whether written agreement is complete and
exclusive statement of terms). 

 The purchase agreement expressly provides that the writing includes all matters
agreed upon. The inclusion of a merger or integration clause does not conclusively establish
the written contract is fully integrated, however. See Bob Robertson, Inc. v. Webster, 679
S.W.2d 683, 688-89 (Tex. App.--Houston [1st Dist.] 1984, no writ). In Bob Robertson, the
court held that the written contract was not integrated despite a merger clause in the written
agreement. Id. at 688-89. The court stated that the "merger clause is contradicted by the
instrument itself, which refers to delivery numerous times and yet contains no delivery date. 
It cannot be said that an oral agreement regarding time of delivery is inconsistent with the
terms of the integrated agreement[.]" Id. at 689.

 The agreement here is a contract for the sale of goods and is governed by article 2 of
the Uniform Commercial Code as codified in chapter 2 of the Texas Business and Commerce
Code. See Tex. Bus. & Com. Code Ann. §§ 2.101-2.725 (Vernon 1994 & Supp. 2007). 
Chapter 2 broadly defines "goods" to mean things that are moveable at the time of
identification to the contract for sale. See id. § 2.105(a). The Morgan product meets that
definition, as Morgan contends. 

 Section 2.202, the parol evidence rule applicable to the sale of goods, provides that
a writing intended to be the final expression of an agreement may not be contradicted with
evidence of any prior agreement or contemporaneous oral agreement. Id. § 2.202. The
agreement may be explained or supplemented, however, by evidence of consistent additional
terms, unless the court finds that the writing was intended to be the complete and exclusive
statement of the terms of the agreement. Id. § 2.202(2). Comment 1 to Section 2.202 makes
clear the section "definitely rejects: (a) [a]ny assumption that because a writing has been
worked out which is final on some matters, it is to be taken as including all the matters
agreed upon[.]" Id. § 2.202 cmt. 1. 

 In determining whether an agreement is integrated, the parol evidence rule does not
bar the consideration of any evidence. See Sun Oil Co., 626 S.W.2d at 731-32; City of
Pinehurst, Tex., v. Spooner Addition Water Co., 432 S.W.2d 515, 518-19 (Tex. 1968). 
Initially, a court must decide whether the parol evidence rule is applicable. See Sun Oil Co.,
626 S.W.2d at 731-32. Only when the rule is applicable does the rule affect whether
evidence will be admitted. See Foreca, S.A. v. GRD Dev. Co., Inc., 758 S.W.2d 744, 746
(Tex. 1988).

 Morgan's brief to this Court explains that the Humane Society wanted to buy "a
boxed-in carport." The purchase agreement describes the structure with the letters "SFB,"
a designation for "steel-frame building." Morrell testified that "these buildings originated
from carports. It's a boxed in carport." The prospect form Sonnier filled out on Meyers's
first visit to Morgan has the "carport" square marked with an "x" and the handwritten letters
"SFB." 

 Morrell explained that a boxed-in carport and a "historical" Morgan building are
different. He testified that because customers wanted a carport configuration that rises up
on the sides, closes in like a building, and has high ceilings, Morgan made boxed-in carports
at customers' requests. The steel frame building designated in the purchase agreement is a
Morgan "boxed-in carport" product. 

 Considering the use of the term "steel-frame building," and the meaning of that term
as a "boxed-in carport," it is apparent the parties intended the roof to be a carport roof. (4) The
purchase agreement does not supply the agreed height of the steel frame building or
otherwise describe the roof, however. 

 The height of the building delivered is a central issue in the parties' contract dispute. (5) 
The roof of a boxed-in carport, or steel frame building, has "eaves" that are extensions of the
roof down the sides of the frame. The purchase agreement specifies the "eave height" is to
be "6," presumably 6 feet, as that is the designated height of the walls to be added. The
purchase agreement does not specify how far the eaves are to extend down the side of the
frame, and the agreed height of the structure cannot be determined from the purchase
agreement. 

 The parties signed a separate document entitled "Clear Span Steel Building
Specifications and Drawing." Morgan argues this separate document was not part of the
contract. Although the purchase agreement permitted a modification in writing signed by
both parties, this document is not a modification of the purchase agreement. The
specifications document references the purchase agreement number. The separate
specifications document has a chart determining width and length dimensions, actual and
nominal, and provides for a drawing of the location of "doors, windows or other features
needed in building." The document expressly reserves certain rights to Morgan, and is a
further indication the written purchase agreement alone was not intended to be a complete
and exclusive statement of all the terms of the parties' agreement. The specifications
document does not provide the intended height of the structure either, nor does it explain
what "Clear Span" means and how the term defines the structure. 

 Considering the surrounding circumstances, we conclude the written purchase
agreement was not intended to embody the complete and exclusive terms of the agreement
of the parties, and is only partially integrated. See generally Magnolia Warehouse & Storage
Co., v. Davis & Blackwell, 108 Tex. 422, 195 S.W. 184, 185 (1917) (written contract
incomplete); see also Garner v. Redeaux, 678 S.W.2d 124, 128-29 (Tex. App.--Houston
[14th Dist.] 1984, writ ref'd n.r.e.). Under the parol evidence rule, the trial court could
consider evidence of consistent additional terms to explain or supplement the terms of the
written agreement. See Tex. Bus. & Com. Code Ann. § 2.202(2). The height of the
building, the meaning of "Clear Span," and the roof type would be consistent terms that
explain or supplement -- and do not contradict -- the terms of the written purchase agreement. 
 The trial court could properly conclude the parties agreed the height of the building
and the type of roof would be the same as the carport identified by Meyers at Morgan's
business. Meyers testified Morgan had to cut the roof off of the building that was delivered
to cure the color problem. The extension of the eave on the carport that Meyers saw at
Morgan was about 18 inches; the eave of the building delivered by Morgan was about 6
inches, after Morgan cut off the roof and installed almond-colored sidings. Morgan did not
deliver the color building it agreed to deliver, and its effort to cure the color did not correct
the height problem. (6) 

 Furthermore, the trial court could reasonably conclude the use of the word "building"
in the contract meant the structure was intended to provide protection from the weather. See
generally Heritage Res., Inc. v. NationsBank, 939 S.W.2d 118, 121 (Tex. 1996) (terms are
given their plain meaning unless the instrument shows the parties used them in a different
sense); see also Webster's Third New International Dictionary of the English
Language 292 (2002). Consistently, Sonnier testified Morgan agreed to supply a
weatherproof building. Morgan does not challenge the trial court's finding that the building
Morgan delivered was not weatherproof. (7) After Morgan constructed the building, it
attempted to address the Humane Society's complaints, including the fact that the structure
was not weatherproof. The roof had holes; the building had spaces that let in the rain. 

 The structure manufactured, delivered and erected was not the correct height or type,
and was not weatherproof. Morgan did not deliver the structure it agreed to supply. Issue
one is overruled. 

Fraud, DTPA, and Warranty Claims


 Issues two, three, four and five assert that the trial court erred in ruling in favor of the
Humane Society on the fraud, DTPA and breach of warranty claims. 

 The elements of a cause of action for common-law fraud are:

 (1) that a material representation was made; (2) the representation was false; 
(3) when the representation was made, the speaker knew it was false or made
it recklessly without any knowledge of the truth and as a positive assertion; 
(4) the speaker made the representation with the intent that the other party
should act upon it; (5) the party acted in reliance on the representation; and (6)
the party thereby suffered injury.


In re FirstMerit Bank, N.A., 52 S.W.3d 749, 758 (Tex. 2001). Failure to perform as
promised, standing alone, is no evidence of fraud, although it may be considered with other
facts to establish fraudulent intent. Spoljaric v. Percival Tours, Inc., 708 S.W.2d 432, 435
(Tex. 1986). 

 There is no evidence Morgan's agents knowingly made false representations to the
Humane Society. We have determined Morgan breached the contract, and did not deliver the
structure it agreed to deliver, but the fraud claim cannot be based solely on a failure to
perform contractual promises. See id. The purchase agreement expressly provided that
Meyers acknowledged she did not rely on extra-contractual representations. Disclaimers of
reliance on extra-contractual representations that arise from negotiated transactions between
sophisticated parties are generally valid. See Schlumberger Tech. Corp. v. Swanson, 959
S.W.2d 171, 180-81 (Tex. 1997). Because there is no evidence of reliance on any
representation other than the terms of the agreement, and no evidence of any intentionally
false statements, the trial court erred in finding that Morgan committed fraud. See In re
FirstMerit Bank, 52 S.W.3d at 758. 

 Reliance is an element of a cause of action for the alleged violations of the DTPA
"laundry list." See Tex. Bus. & Com. Code Ann. §§ 17.46(b), 17.50(a)(1)(B) (Vernon Supp.
2007); Henry Schein, Inc. v. Stromboe, 102 S.W.3d 675, 693 (Tex. 2002). The conduct must
be a producing cause of the alleged injuries. Tex. Bus. & Com. Code Ann. § 17.50(a). The
purchase agreement expressly disclaims the purchaser's reliance on any extra-contractual
representations. The trial court erred in awarding recovery under the DTPA. See Tex. Bus.
& Com. Code Ann. §§ 17.46(b), 17.50(a); Prudential Ins. Co. of Am. v. Jefferson Assocs.,
Ltd., 896 S.W.2d 156, 161 (Tex. 1995).

 The purchase agreement disclaimed any warranties. The written disclaimer of
warranties was preceded by a centered heading in bold print and uppercase letters, which
stated, "No Warranty/No Consequential or Incidental Damages." Section 2.316(b) of the
Texas Business and Commerce Code provides that "to exclude or modify the implied
warranty of merchantability . . . the language must mention merchantability and in case of
a writing must be conspicuous, and to exclude or modify any implied warranty of fitness the
exclusion must be by a writing and conspicuous." Tex. Bus. & Com. Code Ann. § 2.316(b).
The disclaimer in this agreement was written in bold print, all uppercase letters, and included
the word "merchantability." The disclaimer was conspicuous. See id. § 1.201(b)(10)
(Vernon Supp. 2007) (definition of conspicuous). The purchase agreement adequately
disclaimed warranties. The trial court erred in finding to the contrary. See id. §§
1.201(b)(10), 2.316(b). 

 Issues two, three, four and five are sustained.

Damages and Attorney Fees 


 Issues seven and eight assert the trial court erred in awarding the Humane Society
damages and attorney's fees. The Humane Society is entitled to recover damages from
Morgan for breach of the contract. See Tex. Bus. & Com. Code Ann. § 2.714(a). The
building is still in the Humane Society's possession. If a buyer has accepted non-conforming
goods, the buyer may assert damages under section 2.714 of the Business and Commerce
Code. See id. §§ 2.602, 2.606, 2.714(a); Bowen v. Young, 507 S.W.2d 600, 603 (Tex. Civ.
App.--El Paso 1974, no writ). Section 2.714(a) applies to any failure to perform according
to the seller's obligations. See 14 William V. Dorsaneo III, Texas Litigation Guide §
210.31[8][a] (2005); see also 12 John E. Krahmer, Texas Practice: Texas Methods of
Practice § 25.133, at 214 (2005) (Section 2.714(a) "is general enough to include damage
resulting from the seller's failure to perform any contractual obligation[.]"). Under that
section, a buyer who has accepted goods and given notification may recover damages for any
non-conformity and the loss resulting in the ordinary course of events from the seller's
breach, as determined in any manner that is reasonable. Tex. Bus. & Com. Code Ann. §
2.714(a). 

 It has been suggested that when non-conforming goods are delivered, a buyer may
only assert damages for breach of warranty. See, e.g., Ellis v. Precision Engine Rebuilders,
Inc., 68 S.W.3d 894, 896-97 (Tex. App.--Houston [1st Dist.] 2002, no pet.); Chilton Ins. Co.
v. Pate & Pate Enters., Inc., 930 S.W.2d 877, 890 (Tex. App.--San Antonio 1996, writ
denied). Comment 2 to Section 2.714 explains, however, "The 'non-conformity' referred to
in subsection (1) includes not only breaches of warranties but also any failure of the seller
to perform according to his obligations under the contract. In the case of such non-conformity, the buyer is permitted to recover for his loss 'in any manner which is
reasonable.'" Tex. Bus. & Com. Code Ann. § 2.714 cmt. 2. See, e.g., The Mead Corp. v.
McNally-Pittsburg Mfg. Corp., 654 F.2d 1197, 1207 n.14 (6th Cir. 1981); Jetpac Group v.
Bostek, Inc., 942 F.Supp. 716, 720 (Mass. Dist. Ct. 1996); Hooper Handling, Inc. v. Jonmark
Corp., d/b/a Premium Wine and Spirits, 267 A.D.2d 1075, 1075-76, 701 N.Y.S.2d 577, 578
(N.Y. App. Div. 1999). Section 2.714 allows the Humane Society to recover damages for
Morgan's contract breach with respect to the non-conforming goods "as determined in any
manner which is reasonable." Tex. Bus. & Com. Code Ann. § 2.714(a). 

 The damage award here is not supported by sufficient evidence, however, nor is it
determined in a reasonable manner. Under the trial court's judgment, the Humane Society
was given its purchase money back, the continued use of the structure, compensation for the
cost of another building, and compensation for the remodeling of a third building. Double 
recoveries are not ordinarily allowed under law. See Parkway Co. v. Woodruff, 901 S.W.2d
434, 441 (Tex. 1995). Contract damage awards are not intended to be punitive, and a buyer
generally must elect a remedy. See Amoco Prod. Co. v. Alexander, 622 S.W.2d 563, 571
(Tex. 1981) ("Exemplary damages are not allowed for breach of contract."); Foley v. Parlier,
68 S.W.3d 870, 882 (Tex. App.--Fort Worth 2002, no pet.) (explaining that plaintiff with
inconsistent remedies must elect between them). It is not reasonable under the circumstances
here to allow continued use of the purchased goods, recovery of the purchase money, and the
cost of replacement goods in an amount twice the value of the goods purchased. See, e.g.,
Tex. Bus. & Com. Code Ann. §§ 2.607 (effect of acceptance), 2.712 (substitute goods),
2.714(a) (damages for acceptance of non-conforming goods).

 Although the Humane Society argues and Meyers testified the building delivered has
no value for the storage of food or lawn equipment, the Humane Society is making some
other use of the building. The trial court refused to award damages for the cost of the
concrete slab on which the building rests because the court found "the Humane Society is
making some use of the slab, and will, in all likelihood continue to make some use of the
slab." The Morgan building on the slab is the "use" being made of the slab. The record does
not include evidence of the value of the building as it is being used by the Humane Society. 
 Furthermore, the purchase agreement excludes consequential and incidental damages.
See Tex. Bus. & Com. Code Ann. § 2.715 (incidental and consequential damages). The
Humane Society argues and the trial court found that the exclusion was inconspicuous as a
matter of law and unenforceable. The clause is in large conspicuous type, and although the
clause is on the back of the agreement, immediately above the signature line was an
instruction in large uppercase letters to read both sides of the contract. The provision is not
unconscionable, is enforceable, and bars recovery of consequential and incidental damages. 
See id. § 2.719; Wade & Sons, Inc. v. Am. Standard, Inc., 127 S.W.3d 814, 823-24 (Tex.
App.--San Antonio 2003, pet. denied). 

 The Humane Society is entitled to recover reasonable and necessary attorney fees
incurred in pursuing breach of contract damages. See Tex. Civ. Prac. & Rem. Code Ann.
§ 38.001(8) (Vernon 1997). Attorney fees incurred in pursuing the fraud claim are not
recoverable, however, nor are attorney fees incurred in connection with the DTPA and breach
of warranty claims that have no basis. See Tony Gullo Motors I, L.P. v. Chapa, 212 S.W.3d
299, 313-14 (Tex. 2006). In the evidence presented at trial, the attorney fees incurred for
breach of contract were not segregated from the non-recoverable attorney fees. Although
evidence of non-segregated fees is some evidence of segregated fees, it is not sufficient
evidence. See id. at 314. 

 The cause is remanded for a new trial. Issues seven and eight are sustained in part and
overruled in part. (8)

Conclusion


 We reverse the trial court's judgment. Judgment is rendered that the Humane Society
of Southeast Texas take nothing from Morgan Building and Spas, Inc. on the DTPA, fraud,
and warranty claims. The cause is remanded for a new trial on the breach of contract claim. 





 REVERSED. RENDERED IN PART AND REMANDED IN PART.


 
 DAVID GAULTNEY

 Justice


Submitted on September 20, 2007

Opinion Delivered March 13, 2008


Before McKeithen, C.J., Gaultney and Kreger, JJ.

Concurring and Dissenting Opinion



 Although I concur with part of the majority opinion, I respectfully dissent in part. 
Because I believe the contract includes a merger clause that is clear and unambiguous, and
the parol evidence rule precludes consideration of the extra-contractual evidence upon which
the majority relies, I would hold that Morgan did not breach the contract.

 The purchase agreement Meyers signed with Morgan was on 8½" x 14" paper, and
Meyers admitted she did not carefully read the document before she signed it. The purchase
agreement provided that Humane agreed to purchase a 14' x 32' x 6' steel-framed building
with custom double swing-open doors on both ends. Above the signature line, the contract
stated in large, upper-case letters: "read both sides before signing[.]" Below that statement, 
the agreement provided,

 I acknowledge that the additional terms and conditions printed below and on
the back of this agreement are agreed to as part of this agreement the same as
if printed above my signature. By signing below, I am agreeing to purchase
the described product, together with the optional equipment and accessories
described hereon. This agreement contains the entire understanding between
you and Morgan and no other representation or inducement, verbal or written,
has been made which is not written hereon.


At the bottom of the first page of the contract was a second statement that both sides of the
contract were part of the agreement. The contract further stated, "Morgan makes no
representation or warranty of any kind, expressed [sic] or implied, as to merchantability,
fitness for a particular purpose, [or] the compliance or conformity of the building(s) with any
applicable zoning, building, electrical or plumbing code. . . ." The provision disclaiming
express or implied warranties was in significantly larger type than the rest of the contract. 
The contract also stated in large bold, upper-case letters that "Morgan shall not be
responsible for any incidental or consequential damages whatsoever resulting from the
performance of this contract, whether damages are general or special and whether arising
from breach of contract or tort."

 In addition, the contract stated, "[n]o agent, employee[,] or representative of Morgan
has any authority to bind Morgan to any affirmation, representation[,] or warranty concerning
the building(s) that is not specifically set forth on this Contract[,]" "[t]his Contract contains
the entire agreement between Morgan and purchaser with respect to the building(s)[,]"
"[t]here are no other promises, agreements[,] or warranties affecting the work to be
performed hereunder[,]" and "[a]ll previous contracts, offers, solicitations, bids, proposals
and communications relating to the building(s), oral or written, are hereby superseded except
to the extent that they have been expressly incorporated into this written Contract." Finally,
the purchase agreement also provided that the contract "may not be modified other than in
writing. Any such modification(s) will be binding on the parties only if signed by all the
parties to this Contract." On the same date that the parties entered into the purchase
agreement, they also executed a document entitled "Clear Span Steel Buildings
Specifications and Drawing" ("the specifications"). The specifications indicated that
Humane was to provide the slab and the base rail, and Morgan was to install an actual-width
13'9" x 31' x 6' building with almond-colored siding and green roof and trim. (9)

 As the majority acknowledges, the purchase agreement contains a merger clause,
which states that the purchase agreement constitutes the entire agreement between the parties
and supersedes any previous communications, contracts, offers, solicitations, and bids, as
well as a provision stating that no representative of Morgan has the authority to make
representations that would bind Morgan. The purchase agreement does not provide that the
building will accommodate Humane's shelving; that it will not contain bracing; that it will
be water proof, weather proof, and rodent proof; that the building will be secure from theft;
or that the building will not be rusted. In fact, the purchase agreement contains no express
warranties within its four corners. Therefore, the only way such terms could have become
part of the parties' agreement (either as a term of the contract or as a warranty) was via either
Sonnier's representations or the model Meyers viewed at Morgan's place of business.

 Section 2.313(a)(3) of the Texas Business and Commerce Code provides as follows:

 (a) Express warranties by the seller are created as follows:


 . . . 


 (3) Any sample or model which is made part of the basis of the
bargain creates an express warranty that the whole of the goods
shall conform to the sample or model.

Tex. Bus. & Com. Code Ann. § 2.313(a)(3) (Vernon 1994). However, under section 2.316,
a seller may disclaim both express and implied warranties. See id. § 2.316(a), (b). If the
disclaimer of warranties is valid, then all implied warranties, as well as any express warranty
created by the model carport, were disclaimed by the written purchase agreement. See id.;
see generally Balderson-Berger Equip. Co., Inc. v. Blount, 653 S.W.2d 902, 908 (Tex. App.--Amarillo 1983, no writ). Furthermore, because the contract contained a merger clause, a
model viewed by Meyers before the execution of the purchase agreement is not a term of the
contract. See generally Advertising & Policy Comm. of the Avis Rent A Car Sys. v. Avis Rent
A Car Sys., 780 S.W.2d 391, 394-96 (Tex. App.--Houston [14th Dist.] 1989), vacated on
other grounds, 796 S.W.2d 707 (Tex. 1990); Weinacht v. Phillips Coal Co., 673 S.W.2d 677,
679 (Tex. App.--Dallas 1984, no writ) (Presence of merger clause in contract creates a
presumption that a contract extinguished all other agreements and understandings.).

 As previously stated, the purchase agreement contained the following provision: 
"Morgan makes no representation or warranty of any kind, expressed or implied, as to
merchantability, fitness for a particular purpose, [or] the compliance or conformity of the
building(s) with any applicable zoning, building, electrical or plumbing code. . . ." Section
2.316(b) of the Texas Business and Commerce Code provides that "to exclude or modify the
implied warranty of merchantability . . . the language must mention merchantability and in
case of a writing must be conspicuous, and to exclude or modify any implied warranty of
fitness the exclusion must be by a writing and conspicuous." Tex. Bus. & Com. Code Ann.
§ 2.316(b). Under the statute,

 [a] term or clause is conspicuous when it is so written that a reasonable
person against whom it is to operate ought to have noticed it. A printed
heading in capitals . . . is conspicuous. Language in the body of a form is
'conspicuous' if it is in larger or other contrasting type or color.


Tex. Bus. & Com. Code Ann. § 1.201(10) (Vernon 1994).

 In this case, the written disclaimer of warranties was preceded by a centered heading
in bold print and upper-case letters, which stated, "No Warranty/No Consequential or
Incidental Damages," and the disclaimer itself was written in bold print, all upper-case
letters, and mentioned the word "merchantability." Therefore, the disclaimer was
conspicuous, and the model did not become part of the contract or create a warranty. See id.
§§ 1.201(10), 2.316(b).

 With respect to Sonnier's alleged representations, the contract contains a clear and
unambiguous merger clause, as well as a clause that provides Morgan will not be bound by
its employees' representations. In my view, the majority errs both by finding that despite the
merger clause, the contract was not fully integrated, and by failing to give effect to the clause
concerning representations made by Morgan's employees. In interpreting contracts, courts
should favor an interpretation that does not render any of the contract's provisions
meaningless. Coker v. Coker, 650 S.W.2d 391, 394 (Tex. 1983). Under the majority's
analysis, when an unambiguous contract is silent regarding an issue, terms not included
within its four corners can be read into the contract because such terms do not contradict any
express terms of the written agreement. Unlike the situation presented in Bob Robertson, Inc.
v. Webster, 679 S.W.2d 683, 688-89 (Tex. App.--Houston [1st Dist.] 1984, no writ), the
written contract in this case does not contain any provisions that contradict the merger clause. 
In addition, section 2.202 only permits parol evidence of consistent additional terms when
the parties did not intend the written agreement to be the exclusive statement of their
agreement. See Tex. Bus. & Com. Code Ann. § 2.202.

Conclusion


 I agree with the majority that the DTPA, fraud, and warranty claims have no merit. 
Because I also believe the breach of contract claim is without merit, I would reverse and
render judgment that Humane take nothing from Morgan. 




 

 STEVE McKEITHEN

 Chief Justice



Opinion Delivered March 13, 2008

1. The purchase agreement stated that the building was number 1432YMTYGG1N. 
Sonnier explained only that the number "1432" described the width and length of the
structure. 
2. Meyers hired a contractor to pour the concrete slab.
3. Printed above the nominal dimensions of the width, length and eave height in the
purchase agreement is a reference to "See Para. 19 on back[.]" Paragraph 19 provides:

 Dimension Variations. The overall size of the building(s) is referred to on the
Contract in approximate "nominal" dimensions. Actual dimensions will
always be somewhat different due to availability of materials, manufacturing
and transportation considerations, and other factors. Purchaser agrees that all
dimensions specified and materials furnished pursuant to this contract shall be
considered as approximate "nominal" dimensions and shall be subject to
customary manufacturing variations and tolerances. (emphasis added). 

Sonnier testified that the "other factors" referred to in the purchase agreement would include
the specific requirements of a customer.
4. "[W]ords always need interpretation." Stewart v. Selder, 473 S.W.2d 3, 7 (Tex.
1971). When a word has a specialized meaning in a business, it is given the meaning it is
understood to have in that business. See Heritage Res., Inc. v. NationsBank, 939 S.W.2d
118, 121 (Tex. 1996).
5. The trial court found that the following defects were material breaches of the
parties' agreement: (1) the building was significantly shorter than the model Meyers
requested, (2) the building Morgan provided was not a Clear-Span steel building, (3) the
building could not accommodate the Human Society's pre-existing shelving, (4) the
building contained bracing, which hindered its use by shortening its effective height, (5)
the building was not waterproof, (6) the building was not weatherproof, (7) the building
was not rodentproof, (8) the building was not secure, (9) the building was the wrong color,
and (10) the building was rusting. The trial court found that Morgan cured the problems
with the rust and the color of the building. The trial court found that the "sample carport
model Meyers first observed and requested" became part of the parties' agreement. 
6. Additionally, although the concrete slab was as specified by Morgan, the structure
delivered by Morgan did not fit on the "rat lip" of the slab. The court found that the walls
did not reach the slab and a space existed "where rodents and other vermin are free to enter
and exit[.]"
7. There are thirty-four findings of fact, and many if not all contain numerous
additional findings or subparts. Contained within finding of fact number six, for example,
are approximately thirteen factual findings. A trial court is to make findings only on
controlling issues raised by the pleadings and evidence. Limbaugh v. Limbaugh, 71
S.W.3d 1, 6 (Tex. App.--Waco 2002, no pet.); see also ASAI v. Vanco Insulation
Abatement, Inc., 932 S.W.2d 118, 122 (Tex. App.--El Paso 1996, no writ). Morgan
makes no objection to the large number of findings, however. 
8. Because issue six concerning admission of evidence would not result in greater
relief than a new trial and its resolution is not necessary to the final disposition of this
appeal, we need not address that issue. See Tex. R. App. P. 47.1.
9. According to the specifications, the nominal width of the building would be fourteen
feet, and the nominal length would be thirty-two feet.