COURT OF APPEALS


EIGHTH DISTRICT OF TEXAS


EL PASO, TEXAS





JOY B. ADAMS D/B/A ELLYSON
ABSTRACT & TITLE CO., and

ELLYSON ABSTRACT & TITLE CO.,
L.L.C.,


 Appellants,


v. 


DAVID BRUCE McFADDEN AS
INDEPENDENT EXECUTOR OF THE
ESTATE OF FREIDA H. McFADDEN,
DECEASED,


 Appellee. 
§


 


§


 


§


 


§


 


§



§


 §


 §


No. 08-07-00071-CV



Appeal from


 112thDistrict Court


of Pecos County, Texas


(TC # P-10314-112-CV)




O P I N I O N



 Joy B. Adams and Ellyson Abstract & Title Company, L.L.C. appeal from a judgment
rendered in favor of David Bruce McFadden as Independent Executor of the Estate of Freida H.
McFadden. (1) We affirm the judgment with regard to liability and damages. We reverse that portion
of the judgment awarding attorneys' fees and remand for a new trial on that issue. 

FACTUAL SUMMARY


 In1982 or 1983, Freida McFadden purchased Ellyson Abstract and Title Company with
offices located in Fort Stockton and Alpine, Texas. For the majority of this time period, it was the
only title company in Fort Stockton. Joy Adams worked for Freida in the Alpine office for two or
three years and Freida sold Joy the Alpine office in 1986 or 1987. In 1999, Joy discussed purchasing
the Fort Stockton office for $300,000 but the transaction was not consummated. Around November
2000, Joy learned through a third party that Freida wanted to sell the Fort Stockton company for
$150,000. Joy called Freida and agreed to purchase Ellyson Abstract for that price. Joy contacted
an attorney Freida had recommended to draft the documents. On December 22, 2000, Joy and Freida
executed an Improved Property Commercial Contract conveying the real property to Joy and her
husband, E.P. "Apache" Adams, for the purchase price of $150,000. On January 5, 2001, Freida
executed a bill of sale conveying to Joy and Apache all of the personal property situated at the offices
of Ellyson Abstract & Title Company in Fort Stockton, including but not limited to "all furniture,
fixtures, computers including all soft ware and any records contained in the hard drive, all files, all
card files of legal transactions, typewriters, calculators, adding machines, copiers, telephones, all
office supplies, and any and all other personal property situated at the location of Ellyson Abstract
and Title Company." At the time of sale, there were two title insurance commitments with pending
closings. These commitments related to large tracts of land and were referred to as the "Windfarm
Projects." One was referred to as the Chicago Abstract Project and the other as the Stewart Title
Project. Only the Stewart Title project eventually closed through Ellyson Abstract. 

 McFadden alleged--and the jury found--that Freida and Joy had an oral agreement that Freida
would receive the proceeds from the two pending title commitments because they had been written
before the sale. In the year following Joy's purchase of the business, Ellyson Abstract & Title Co.,
L.L.C., received $416,475.30 from the Stewart Title deal. Joy did not notify Freida that the money
had been received and she threatened the employees at Ellyson Abstract with termination if any of
them informed Freida about it. Freida's attorney wrote a letter to Joy demanding that she pay her
the proceeds received on the Windfarm Project, but Joy did not do so. Freida died on July 19, 2003
and her son, Bruce McFadden, in his capacity as executor of his mother's estate, filed suit against
Joy Adams, E.P. Adams, and Ellyson Abstract & Title Company, L.L.C., asserting claims for breach
of contract, conversion, breach of fiduciary duty, and common law fraud. A jury found in
McFadden's favor on the breach of contract, breach of fiduciary duty and conversion claims but
found in favor of Joy on the fraud claim. The jury awarded actual damages in the amount of
$169,036.32 and reasonable attorneys' fees in the amount of $205,000. The jury also found that Joy
intentionally breached her fiduciary duty, but it did not award exemplary damages. The trial court
entered judgment in favor of McFadden based on the jury's verdict. 

ILLEGALITY


 In Issue One, Appellants contend that an oral agreement requiring Joy to pay the proceeds
from the premium issued on the title policy is illegal as a matter of law because at the time the
proceeds were received Freida no longer had a license to conduct insurance business, and therefore,
Joy could not legally pay her the premium. For the same reason, Appellants also argue that the
contract is unenforceable as a matter of law.

 At the conclusion of McFadden's case-in-chief, Appellants moved for an instructed verdict
on the ground that the oral contract, if it existed, was illegal. In support of their motion, Appellants
asked the trial court to take judicial notice of their motion for summary judgment and the attached
records from the Texas Department of Insurance showing that the licenses of Ellyson Abstract were
cancelled on June 14, 2001 and Freida's license was cancelled on June 22, 2001. (2) The court inquired
why it should take judicial notice and asked Appellants whether they wished to introduce the
evidence before the jury. Appellants insisted it was a question of law. The trial court did not
affirmatively take judicial notice but simply instructed counsel to proceed. The court overruled the
motion for instructed verdict on the ground of illegality. 

 Appellants did not request the submission of any questions to the jury on their affirmative
defense of illegality (3) or their defense of impossibility of performance. Appellants raised the issue
again in their motion for new trial. In the section of their motion challenging the legal and factual
sufficiency of the evidence supporting the jury's finding that Joy breached the oral agreement,
Appellants stated: "As a matter of law, Joy Adams could not share proceeds of a title insurance
premium with Freida McFadden and could not therefore have breached any agreement which may
have existed. As more fully stated in Defendants' Motion for Summary Judgment, any such
agreement is rendered void because such a contract would violate the law and by the doctrine of
impossibility." Appellants also filed a motion for judgment notwithstanding the verdict. Citing
Sections 2502.051 (4) and 2502.053 (5) of the Texas Insurance Code, they alleged that McFadden's causes
of action were "barred as a matter of law" because any oral agreement for Joy to pay Freida proceeds
from the title policies was void and unenforceable. The trial court overruled both motions. 

 The validity of a contract is generally a question of law. Farah v. Mafrige & Kormanik, P.C.,
927 S.W.2d 663, 678 (Tex. App.--Houston [1st Dist.] 1996, no writ). An illegal contract is one in
which the parties undertake what the law forbids. Franklin v. Jackson, 847 S.W.2d 306, 309
(Tex.App.--El Paso 1992, writ denied). A contract to do a thing which cannot be performed without
a violation of the law is void. Id. Because the contract violates the law, it imposes no legal
obligation on the parties. Miller v. Long-Bell Lumber Co., 148 Tex. 160, 222 S.W.2d 244, 246 (Tex.
1949); Franklin, 847 S.W.2d at 309. However, a contract which could have been performed in a
legal manner will not be declared void simply because it may have been performed in an illegal
manner. Franklin, 847 S.W.2d at 309, citing Lewis v. Davis, 145 Tex. 468, 199 S.W.2d 146, 148-49
(1947); Wade v. Jones, 526 S.W.2d 160, 162-63 (Tex.Civ.App.--Dallas 1975, no writ). The law
presumes that contracts are legal, and the burden to prove illegality is on the party asserting it, in this
case, Appellants. See Franklin, 847 S.W.2d at 310. Unless the face of the contract shows it is
illegal, the party asserting illegality must present evidence demonstrating the illegality before a court
may declare the contract void. See Lewis, 199 S.W.2d at 149; Franklin, 847 S.W.2d at 310.

 We begin with the presumption that the contract is legal. Appellants did not introduce any
evidence establishing that the contract was illegal at the time it was made. Nor do they allege that
Freida did not hold the appropriate licenses at the time of the oral agreement that Joy would pay her
the proceeds received from the two Windfarm Projects. Because the contract could have been
performed in a legal fashion at the time it was made, Appellants had the burden to introduce
evidence proving illegality. This they failed to do. We overrule Issue One.

UNENFORCEABILITY


 In their second issue, Appellants maintain that the oral agreement is unenforceable because
the written agreement is unambiguous and constitutes the entire agreement of the parties. Appellants
contend that Joy acquired the right to the premiums earned from the windmill projects when she
purchased the business because Freida conveyed the "files" to her as part of the transaction, which
included the right to those premiums. In their reply brief, Appellants have expanded upon this
argument. Pointing to an integration clause in the written contract, they allege that the oral
agreement is unenforceable and the written agreement must be enforced as written and cannot be
added to or varied by parol evidence. 

 The parol evidence rule is a rule of substantive contract law, not evidence. Hubacek v. Ennis
State Bank, 159 Tex. 166, 317 S.W.2d 30, 31 (1958); DeClaire v. G & B McIntosh Family Limited
Partnership, 260 S.W.3d 34, 45 (Tex.App.--Houston [1st Dist.] 2008, no pet. h.). We review parol
evidence questions de novo, as questions of law. DeClaire, 260 S.W.3d at 45.

 When the parties have concluded a valid, integrated agreement, the parol evidence rule
precludes enforcement of a prior or contemporaneous inconsistent agreement. Edascio, L.L.C. v.
NextiraOne L.L.C., 264 S.W.3d 786, 796 (Tex.App.--Houston [1st Dist.] 2008, pet. filed); ISG State
Operations, Inc. v. National Heritage Insurance Company, 234 S.W.3d 711, 719 (Tex.App.--Eastland 2007, pet. denied). The execution of a written contract presumes that all prior negotiations
and agreements relating to the transaction have been merged into the written contract. Edascio, 264
S.W.3d at 796; ISG State Operations, 234 S.W.3d at 719. Consequently, the agreement will be
enforced as written and cannot be added to, varied, or contradicted by parol evidence. Edascio, 264
S.W.3d at 796; ISG State Operations, 234 S.W.3d at 719. The parol evidence rule is particularly
applicable when the written contract contains a recital that it contains the entire agreement between
the parties or a similarly-worded merger provision. Edascio, 264 S.W.3d at 796. Evidence that
violates the rule is incompetent and without probative force, and cannot properly be given legal
effect. Garner v. Fidelity Bank, N.A., 244 S.W.3d 855, 859 (Tex.App.--Dallas 2008, no pet.).

 Parol evidence may be admissible to show collateral, contemporaneous agreements that are
consistent with the underlying agreement. Gary E. Patterson & Associates, P.C. v. Holub, 264
S.W.3d 180, 197 (Tex.App.--Houston [1st Dist.] 2008, pet. denied); DeClaire, 260 S.W.3d at 45. 
But this exception does not permit parol evidence that varies or contradicts either the express terms
or the implied terms of the written agreement. Gary E. Patterson, 264 S.W.3d at 197; DeClaire,
260 S.W.3d at 45. A collateral agreement is one the parties might naturally make separately, i.e.,
one not ordinarily expected to be embodied in, or integrated with the written agreement and not so
clearly connected with the principal transaction as to be part and parcel of it. Garner, 244 S.W.3d
at 859. 

 An agreement is integrated if the parties intended a writing to be a final and complete
expression of agreed terms. Morgan Buildings and Spas, Inc. v. Humane Society of Southeast Texas,
249 S.W.3d 480, 486 (Tex.App.--Beaumont 2008, no pet.). The inclusion of a merger or integration
clause does not conclusively establish that the written contract is fully integrated. Id. A fully
integrated written agreement is a final and complete expression of all the terms agreed upon by the
parties. Id. A partially integrated agreement is a final and complete expression of all the terms
addressed in that written agreement, but is not a final and complete expression of all the terms the
parties have agreed upon. Id. A court considers the surrounding circumstances in determining
whether, and to what degree, an agreement is integrated. Id. 

 Joy and Freida did not have a written agreement whereby Freida sold Ellyson Abstract to Joy. 
Instead, Freida sold Joy the real property, including improvements, the abstract plant, and the
personal property located on the business premises. Joy and Freida signed the improved property
commercial contract on December 22, 2000, whereby Freida agreed to convey the real property to
Joy for $150,000. Section 11 of the contract, entitled "Special Provisions" provided as follows: 
"This sale shall include the real estate and all improvements located thereon; All equipment,
computers, supplies, abstract plant, copiers, fax machines, Seller will net $150,000.00." The
contract also included an integration clause in Section 22(C): "This contract contains the entire
agreement of the parties and may not be changed except by written agreement." 

 Despite the real property contract's recitation that it contains the entire agreement of the
parties, it did not set forth all the terms of the sale and transfer of personal property. On January 5,
2001, Freida executed a "Bill of Sale" which recited the sale of certain personal property to E.P.
Adams and Joy B. Adams, effective January 30, 2001. The Bill of Sale includes the following
description of the property:

 All of the personal property situated at the offices of Ellyson Abstract and Title
Company at 117 South Main, Fort Stockton, Pecos County, Texas, 79735 . . .
including but not limited to all furniture, fixtures, computers including all soft ware
and any records contained in the hard drive, all files, all card files of legal
transactions, typewriters, calculators, adding machines, copiers, telephones, all office
supplies, and any and all other personal property situated at the location of Ellyson
Abstract and Title Company. 


The Bill of Sale sets forth the terms of the personal property transferred from Freida to Joy and it
listed items that were not included in the real property contract. Appellants claim that the orders for
title commitments were personal property and were included in the Bill of Sale as "files." A
"commitment for title insurance" is defined by the Texas Insurance Code to mean a title insurance
form under which a title insurance company offers to issue a title insurance policy subject to stated
exceptions, requirements, and terms. Tex.Ins.Code Ann. § 2701.001(a)(Vernon 2009). A
commitment for title insurance constitutes a statement of the terms and conditions on which a title
insurance company is willing to issue its policy. Tex.Ins.Code Ann. § 2701.001(b)(Vernon 2009). 
The real property contract and the bill of sale are silent with respect to the right to the premiums
from the Windfarm Projects, neither of which had closed at the time of the sale. In support of their
argument that "files," as used in the Bill of Sale, meant orders for commitments, Appellants point
to the testimony of Brenda Faubion, a former employee of Ellyson Abstract. During Appellants'
cross-examination, counsel asked Faubion what makes up a title plant, and she responded "[t]he
records, the equipment, the files." She explained that an abstract plant is comprised of the records
which show property title. The following exchange then occurred:

 [Appellants' counsel]: What do you mean by 'files'?

 [Faubion]: I mean the existing files that were left there.

 [Appellants' counsel]: People that had asked for commitments. Right?

 [Faubion]: Right.

 [Appellants' counsel]: Pending work. Right?

 [McFadden's counsel]: Object as to form.

 [Appellants' counsel]: Pending work. Right?

 [Faubion]: Yes.

Faubion's testimony as to the meaning of the term "files" is incompetent parol evidence because
Appellants, who have asserted throughout trial and appeal that the contracts are unambiguous,
offered it to explain the meaning of the term "files" in the Bill of Sale. Swinnea v. ERI Consulting
Engineers, Inc., 236 S.W.3d 825, 835 (Tex.App.--Tyler 2007, pet. filed)(parol evidence rule
prohibits the admission of extrinsic evidence to vary or explain the terms or contradict the legal
effect of an unambiguous written instrument in the absence of a showing of fraud, accident, or
mistake in its preparation).

 Even if Faubion's testimony on the subject of the meaning of the term "files" is competent
evidence, it does not address who had the right to the premiums. There is no language in the real
property contract or the bill of sale by which Freida unambiguously expressed an intent to transfer
to Joy the right to the premiums from the Windfarm Projects as part of the sale. Considering the
surrounding circumstances, we conclude that the real property contract is only partially integrated
because it does not fully address the transfer of personal property and it does not address at all the
right to the premiums from the pending title commitment orders. McFadden's expert witness, Bert
Massey, expressed an expert opinion that he would have expected the contract between the parties
to address accounts receivable, accounts payable, and work in progress, but it did not. He went on
to explain that he would have expected the parties to have an agreement pertaining to outstanding
obligations of Ellyson Abstract, to income that the seller expected to receive but which had not yet
been received, and what value to place on transactions in progress that had not yet closed. Referring
to the two outstanding orders for title commitments, Massey expected to see something in an
agreement relating to what compensation, if any, the prior owner would receive for the work that was
done but not paid for up until the time the transaction closed.

 The parties' oral agreement that Joy would pay Freida the premiums when the Windfarm
Projects closed does not contradict the written agreement. Therefore, the evidence regarding the oral
contract is competent evidence and the oral contract does not violate the merger doctrine. Issue Two
is overruled.

SUFFICIENCY OF THE EVIDENCE


 In Issue Three, Appellants challenge the legal and factual sufficiency of the evidence
supporting the jury's finding that Joy Adams entered into an oral agreement with Freida McFadden
to pay her the proceeds resulting from title policies issued in connection with the Windfarm Projects. 
Legal Sufficiency


 A "no evidence" or legal insufficiency point is a question of law which challenges the legal
sufficiency of the evidence to support a particular fact finding. Serrano v. Union Planters Bank,
N.A., 162 S.W.3d 576, 579 (Tex.App.--El Paso 2004, pet. denied). There are two separate "no
evidence" claims. Id. When the party having the burden of proof suffers an unfavorable finding,
the point of error challenging the legal sufficiency of the evidence should be that the fact or issue was
established as "a matter of law." Id. When the party without the burden of proof suffers an
unfavorable finding, the challenge on appeal is one of "no evidence to support the finding." Id.; In
re Estate of Livingston, 999 S.W.2d 874, 879 (Tex.App.--El Paso 1999, no pet.). In this case,
McFadden had the burden to prove the existence of the oral contract.

 An appellate court will sustain a legal sufficiency or "no-evidence" challenge if the record
shows: (1) the complete absence of a vital fact, (2) the court is barred by rules of law or evidence
from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to
prove a vital fact is no more than a scintilla, or (4) the evidence establishes conclusively the opposite
of the vital fact. City of Keller v. Wilson, 168 S.W.3d 802, 810 (Tex. 2005); El Paso Independent
School District v. Pabon, 214 S.W.3d 37, 41 (Tex.App.--El Paso 2006, no pet.). In conducting our
review, we consider the evidence in the light most favorable to the verdict and indulge every
reasonable inference that would support it. City of Keller, 168 S.W.3d at 822. Even if evidence is
undisputed, it is the province of the trier of fact to draw from it whatever inferences it wishes so long
as more than one inference is possible. Id. at 821. But if the evidence allows only one inference,
neither the trier of fact nor the reviewing court may disregard it. Id. at 822. We are also mindful that
the trier of fact is the sole judge of the credibility of the witnesses and the weight to be given their
testimony. Id. at 819. When there is conflicting evidence, it is the province of the trier of fact to
resolve such conflicts. Id. at 820. In every circumstance in which a reasonable trier of fact could
resolve conflicting evidence either way, the reviewing court must presume it did so in favor of the
prevailing party, and disregard the conflicting evidence in its sufficiency review. Id. at 821. If the
evidence at trial would enable reasonable and fair-minded people to differ in their conclusions, then
the trier of fact must be allowed to do so. Id. at 822. So long as the evidence falls within this zone
of reasonable disagreement, we may not substitute our judgment for that of the trier-of-fact. Id. The
ultimate test for legal sufficiency is whether the evidence at trial would enable reasonable and
fair-minded people to reach the verdict under review. Id. at 827.

 Despite Joy's denial that an oral agreement existed, there is evidence from which the jury
could have found Joy agreed to pay Freida the premiums from the Windfarm Projects. Before his
mother died, Bruce McFadden asked employees at Ellyson Abstract on several occasions whether
the Windfarm Projects had closed. Each time, the employees said they had not. While driving along
I-10 in July 2002, Bruce saw that the windfarm had gone up. Consequently, he called Joy and asked
her if the Windfarm Projects had closed. She said they had, and Bruce asked when his mother was
going to get her money. Joy replied, "I've been beating myself about the head and shoulders trying
to figure out a way to get her paid." Joy revealed that she had been speaking to the Texas Insurance
Commission and they would not allow Joy to pay her. Bruce told Joy that it was his mother's
retirement money and she was counting on it. He then asked Joy whether she had used his mother's
money to buy the new $65,000 Cadillac Escalade he had seen sitting in the parking lot. Joy replied,
"Bruce, I haven't spent one dime of your mother's money on that car." Bruce told Joy he would call
her the next day and they hung up. Bruce called her a couple of days later and Joy advised him that
she had an attorney and Bruce should call him. Bruce also testified that after the sale of Ellyson
Abstract, his mother had retained an Ellyson Abstract escrow account to receive the premiums from
the Windfarm Projects. According to him, there would have been no other reason for her to keep
an escrow account. His mother kept the account open until the day she died. 

 Jack McIntyre, an independent businessman, spoke with Freida in July or August of 2000
about purchasing Ellyson Abstract. Freida said the sale would include the building and the business
but she clearly indicated to him that she would retain two "windmill contracts." She did not
specifically tell McIntyre what the contracts were worth but he understood that it was a substantial
amount of money. McIntyre did not purchase the business because he could not afford it at the time. 
 Brenda Faubion worked for both Freida and Joy at Ellyson Abstract. On March 30, 2001,
Ellyson Abstract remitted two cashier's checks to "Freida McFadden dba Ellyson Abstract," one in
the amount of $4,405.87 and the other in the amount of $6,567.83. On August 8, 2001, Rosie
Causey, an Ellyson Abstract employee, sent a check to Freida in the amount of $5,631 with the
notation "Woodward Mtn TWP-06-03." Causey attached a note which stated, "Freida, I know this
isn't exactly what you were expecting, but we've had to separate the charges for Cielo and Chicago
Title. Cielo is paying for their charges but we have not received anything from Chicago." Freida
called Ellyson Abstract and spoke with Faubion about these checks. Faubion told Freida that Joy
had instructed them to send the checks to her. Freida asked her whether the main part of the
transaction had closed and Faubion told her it had not. Freida said that she was not going to cash
the checks because she believed the deal was going to close and she did not want it to appear that
she was agreeing to take the lesser amount of money. Freida indicated to Faubion she expected to
receive the money when the deal closed because they had done 90 percent of the work.
Approximately six months after the sale of Ellyson Abstract, Faubion spoke with Bruce McFadden. 
He asked her whether the Windfarm Projects had closed. She told him they had not. Two weeks
later, Bruce went to the office and spoke with Faubion about uncashed checks he had found. 
According to Faubion, some of the checks were for title policy premiums that had been collected
after Joy had purchased Ellyson Abstract. Faubion assumed that those checks had not been cashed
because they had been misplaced. Three or four other checks were from Cielo Land on the Chicago
Title transaction. Faubion knew from her prior conversation with Freida that she purposely had not
cashed those checks. Faubion recalled that after Ellyson Abstract received the money for the Stewart
Title policy, Joy told her that she did not know whether she would be able to give Freida any of the
money. Joy explained that she had contacted Stewart Title in San Antonio and they questioned
whether it was legal for Joy to disburse any of it to Freida. 

 Melody Tijerina, a former employee of Ellyson Abstract, testified that Joy warned the
employees if any of them told Freida that the money from the Windfarm Projects had come in, she
would fire all of them. It was because of this threat that Tijerina never told Freida that the money
had been received. Tijerina knew Joy's threat was related to a condition of the sale of Ellyson
Abstract to Joy. Tijerina quit working for Ellyson Abstract in 2001 because of Joy's conduct and
she moved to Idaho. Tijerina regretted never telling Freida that the money from the Windfarm
Projects had been received in July of 2001, but she told Bruce in January of 2006 what she knew. 
 Finally, McFadden offered expert testimony to prove the existence of an oral agreement. 
Bert Massey is a Texas attorney who practices real estate law and has owned a title insurance agency
since 1980. Massey is also a licensed escrow officer and is an approved examining attorney of real
estate titles for five title insurance underwriting companies who do business in Texas. Massey has
qualified as an expert on title insurance in proceedings before the State Insurance Board and State
Insurance Commission. In preparation for his testimony, Massey reviewed a large amount of
documents, including the order sheets on two potential title insurance transactions and the documents
related to the sale of Ellyson Abstract to Joy. He also reviewed McFadden's trial exhibit notebooks. 
In Massey's opinion, there was an oral agreement between the parties. He based his opinion on the
issuance of checks from Ellyson Abstract to Freida, the former owner. He stated there had to
be an agreement relating to some matters that were going to happen after the closing because there
would have been no need for the payments to be made after the business was sold. In connection
with his review of the documents pertaining to the sale of Ellyson Abstract to Joy, Massey testified
that the written contracts did not address accounts receivable, accounts payable, and work in
progress. He explained that he would have expected the parties to have an agreement pertaining to
outstanding obligations of Ellyson Abstract, to income that the seller expected to receive but which
had not yet been received, and what value to place on transactions in progress that had not yet closed. 
Referring to the two outstanding orders for title commitments related to the Windfarm Projects,
Massey expected to see something in an agreement relating to what compensation, if any, the prior
owner would receive for the work that was done but not paid for up until the time the transaction
closed. The written agreements did not address any of these matters. Massey concluded that the
parties must have had an oral agreement because Ellyson Abstract paid monies to Freida after the
sale. In his thirty-six years in the title insurance business, Massey had never worked on any title
commitments as valuable as the Windfarm Projects. In his opinion, there was no question that most
rural title insurance companies would consider these to be the deals of a lifetime. 

 In addition to expert testimony, there was other evidence relevant to the existence of an oral
contract. Freida offered to sell the business to Jack McIntyre but made clear to him that the sale
would not include the Windfarm Projects. Joy purchased the business for one-half of the price she
had been quoted two years earlier. After purchasing Ellyson Abstract, Joy threatened to fire her
employees if any of them told Freida that Ellyson Abstract had received the money from the
Windfarm Projects. Melody Tijerina knew that Joy's threat was related to a condition of the sale of
Ellyson Abstract. Joy had Ellyson Abstract employees forward checks to Freida several months after
the sale. After Ellyson Abstract received the proceeds from the Stewart Title deal, Joy told Brenda
Faubion that she did not know whether she would be able to give the money to Freida. This is
contrary to her position at trial that Freida did not retain any right to the premiums when she sold the
business. Similarly, when Bruce McFadden called Joy in July 2001 about the closing of the
Windfarm Projects and his mother's money, Joy did not indicate any surprise or disagreement that
Freida expected to receive money in connection with the closing of the Windfarm Projects but
instead said she was trying to figure out a way for his mother to get "her money." When Bruce asked
Joy whether she had purchased a new vehicle with his mother's money, Joy again referred to the
money as Freida's money and insisted she had not spent one penny of "your mother's money." 
When viewed in the light most favorable to the verdict, the foregoing evidence supports a conclusion
that Freida retained the right to the premiums from the Windfarm Projects when she sold the
business to Joy, and Joy and Freida had an oral agreement that Freida would receive the premiums
when Windfarm Projects closed.

Factual Sufficiency


 In reviewing a challenge to the factual sufficiency of the evidence supporting a vital fact, we
must consider, weigh, and examine all of the evidence in the record, both supporting and against the
finding, to decide whether the verdict should be set aside. Plas-Tex, Inc. v. U.S. Steel Corp., 772
S.W.2d 442, 445 (Tex. 1989). When a party attacks the factual sufficiency of an adverse finding on
an issue on which the opposing party has the burden of proof, we should set aside the verdict only
if the evidence supporting the jury finding is so weak as to be clearly wrong and manifestly unjust. 
See Cain v. Bain, 709 S.W.2d 175, 176 (Tex. 1986). We are not permitted to substitute our
judgment for that of the jury. Golden Eagle Archery, Inc. v. Jackson, 116 S.W.3d 757, 761-62 (Tex.
2003). Further, we bear in mind that the jury is the sole judge of the credibility of witnesses and the
weight to be given to their testimony. Id.

 As noted in our discussion of the legal sufficiency challenge, Joy denied the existence of an
oral agreement. Appellants challenged the credibility of the witnesses who testified in support of
a finding that an oral agreement existed. Joy explained that the two checks sent to Freida in March 
2001 were funds Freida left in Ellyson Abstract's escrow account. She said Freida was entitled to
the check issued by Cielo Land in connection with the Chicago Title deal because it was a
reimbursement for her expenses. It was the jury's task to determine credibility and resolve conflicts
in the evidence. The record does not demonstrate that the evidence supporting the jury's finding is
so weak as to be clearly wrong and manifestly unjust. We overrule Issue Three.


CONVERSION AND BREACH OF FIDUCIARY DUTY


 In Issues Four and Five, Appellants raise sufficiency challenges to the jury's findings on the
conversion and breach of fiduciary duty causes of action. It is unnecessary to address these issues
because the jury's finding on the breach of contract cause of action will support the judgment.

CHARGE ERROR


 In Issue Six, Appellants assert that the trial court failed to instruct the jury on the various
elements of damages recoverable in connection with the breach of contract, breach of fiduciary duty
and conversion causes of action. (6) Question 7 in the court's charge asked the following:

 What sum of money, if any, if paid now in cash, would fairly and reasonably
compensate The Estate of Freida McFadden for its damages, if any, for the conduct
described in Questions 2, 4, 5, or 6? 


The instructions accompanying this question did not include any instructions on the proper measure
of damages.

 Damages must be measured by a legal standard and that standard must be used to guide the
fact finder in determining what sum would compensate the injured party. Jackson v. Fontaine's
Clinics, Inc., 499 S.W.2d 87, 90 (Tex. 1973). A jury question which fails to guide the jury on any
proper legal measure of damages is fatally defective. Id. To preserve error, the complaining party
must object to the charge and tender the instructions in substantially correct form. Tex.R.Civ.P.
278; (7) Jim Howe Homes, Inc. v. Rogers, 818 S.W.2d 901, 903 (Tex.App.--Austin 1991, no writ). 
While Appellants objected at the charge conference that Question 7 did not include instructions on
the measure of damages for the various legal theories, they did not submit in writing a request for
an instruction. Consequently, this issue is waived. We overrule Issue Six.

SEGREGATION OF ATTORNEYS' FEES


 In Issue Seven, Appellants argue that McFadden failed to segregate attorneys' fees. A party
seeking attorneys' fees must show that the fees were incurred on a claim that allows recovery of such
fees, and thus is ordinarily required to segregate fees incurred on claims allowing recovery of fees
from those that do not. Stewart Title Guaranty Company v. Aiello, 941 S.W.2d 68, 73 (Tex. 1997). 
There is an exception to this rule. (8) When discrete legal services advance both recoverable claims
and unrecoverable claims, attorneys are not required to segregate fees to recover the total amount
covering all claims. See Tony Gullo Motors I, L.P. v. Chapa, 212 S.W.3d at 299, 313 (Tex. 2006);
CA Partners v. Spears, 274 S.W.3d 51, 81 (Tex.App.--Houston [14th Dist.] 2008, pet. denied). In
Tony Gullo Motors, the Supreme Court eliminated the exception to the segregation requirement for
fees incurred solely on a separate but intertwined claim. Tony Gullo Motors, 212 S.W.3d at 313-14. 
If any attorneys' fees relate solely to a claim for which such fees are unrecoverable, the claimant
must segregate recoverable from unrecoverable fees. Id. at 313. This standard does not require
attorneys to keep separate time records when they draft the breach of contract and fraud paragraphs
of a petition. See id. at 314. The amount of recoverable attorneys' fees is sufficiently segregated if,
for example, the attorney testifies that a given percentage of the drafting time would have been
necessary even if the claim for which attorneys' fees are recoverable had not been asserted. Id. at
314; see CA Partners, 274 S.W.3d at 82; 7979 Airport Garage, L.L.C. v. Dollar Rent A Car Systems,
Inc., 245 S.W.3d 488, 509 (Tex.App.--Houston [14th Dist.] 2007, pet. denied). The need to
segregate attorneys' fees is a question of law, while the extent to which claims can or cannot be
segregated is a mixed question of law and fact. Tony Gullo Motors, 212 S.W.3d at 312-13; CA
Partners, 274 S.W.3d at 82.

 McFadden asserts that Appellants waived the error by failing to object to counsel's testimony
on attorney's fees. Appellants preserved their complaint by objecting to the charge. See Hong Kong
Development, Inc. v. Nguyen, 229 S.W.3d 415, 454 (Tex.App.--Houston [1st Dist.] 2007, no
pet.)(objection to charge preserved error related to unsegregated attorney's fees); Young v.
Neatherlin, 102 S.W.3d 415, 420 (Tex.App.--Houston [14th Dist.] 2003, no pet.)(holding that
objection to charge preserved challenge, even though party had not objected to testimony on
unsegregated fees); see also McCalla v. Ski River Dev., Inc., 239 S.W.3d 374, 383 (Tex.App.--Waco
2007, no pet.)(to preserve complaint that the opposing party failed to segregate its attorney's fees,
"[g]enerally, such an issue is preserved by objection during testimony offered in support of attorney's
fees or an objection to the jury question on attorney's fees").

 We turn now to the issue of whether McFadden was required to segregate. McFadden argues
that Appellants failed to ask any questions during cross-examination regarding the need to segregate. 
Appellants were not required to cross-examine on the issue because it was McFadden's burden to
prove that fee segregation is not required. See CA Partners, 274 S.W.3d at 82. It cannot be disputed
that a portion of counsel's time was spent drafting the pleadings related to the tort claims. While
McFadden might argue that this time is nominal, unrecoverable fees are not rendered recoverable
merely because they are nominal. See Tony Gullo Motors, 212 S.W.3d at 313; CA Partners, 274
S.W.3d at 84. Consequently, we find that McFadden was required to segregate. See CA Partners,
274 S.W.3d at 84. We sustain Issue Seven. McFadden did not forfeit his right to recover attorney's
fees by failing to segregate them because the evidence he presented regarding the total amount
constitutes some evidence of what the segregated amount should be. See Tony Gullo Motors, 212
S.W.3d at 314; CA Partners, 274 S.W.3d at 84. Therefore, a remand for a new trial on recoverable
attorney's fees is the appropriate remedy. Id.

ADMISSION OF EXPERT TESTIMONY


 In Issue Eight, Appellants contend that the trial court abused its discretion by admitting the
expert testimony of Bert Massey. There are two parts to this issue. First, Appellants assert that
Massey's opinion on this subject was not disclosed during discovery. Second, Appellants argue that
Massey's opinion on this subject is unreliable. We will address the latter issue first.

 Whether to admit or exclude evidence is within the trial court's sound discretion. National
Liability and Fire Insurance Company v. Allen, 15 S.W.3d 525, 527 (Tex. 2000). Accordingly, we
review the admission of expert testimony for an abuse of discretion. Helena Chemical Company v.
Wilkins, 47 S.W.3d 486, 499 (Tex. 2001). The trial court abuses its discretion when its ruling is
arbitrary, unreasonable, or without reference to any guiding rules or legal principles. K-Mart Corp.
v. Honeycutt, 24 S.W.3d 357, 360 (Tex. 2000).


Reliability


 Rule 702 provides:

 If scientific, technical, or other specialized knowledge will assist the trier of fact to
understand the evidence or to determine a fact in issue, a witness qualified as an
expert by knowledge, skill, experience, training, or education may testify thereto in
the form of an opinion or otherwise. 


Tex.R.Evid. 702. For an expert's testimony to be admissible, the expert must be qualified and the
expert's opinion must be relevant to the issues in the case and based upon a reliable foundation. 
Exxon Pipeline Company v. Zwahr, 88 S.W.3d 623, 628 (Tex. 2002); Helena Chemical Company
v. Wilkins, 47 S.W.3d 486, 499 (Tex. 2001).

 Appellants have not challenged Massey's qualifications as an expert or the relevance of his
testimony. They assail only one aspect of his testimony, namely, his conclusion that an oral
agreement existed, and they contend that his conclusion is unreliable. Unreliable evidence is of no
assistance to the trier of fact and is therefore inadmissible under Rule 702. E.I. du Pont de Nemours
& Co. v. Robinson, 923 S.W.2d 549, 557 (Tex. 1995); Greenberg Traurig of New York, P.C. v.
Moody, 161 S.W.3d 56, 93 (Tex.App.--Houston [14th Dist.] 2004, no pet.). The reliability
requirement focuses on the principles, research, and methodology underlying an expert's
conclusions. Zwahr, 88 S.W.3d at 629. But because it is impossible to set the criteria for evaluating
the reliability of expert testimony in non-scientific cases such as this, it is within the trial court's
discretion to determine how to assess reliability. Greenberg Traurig of New York, P.C. v. Moody,
161 S.W.3d at 93.

 Appellants assert that Massey's opinion is unreliable because it is based on the existence of
payments to Freida after the sale and there were other explanations for those payments, including
that some of the payments were from Freida's own escrow account. Those were not the only
payments made to Freida and the existence of the payments was not the only basis for Massey's
opinion. By virtue of his experience, Massey was familiar with the operations of a title company and
with what is involved when such a business is sold. Massey found it unusual that the written
documents did not address accounts receivable, accounts payable, and work in progress. He would
have expected the parties to have an agreement pertaining to outstanding obligations of Ellyson
Abstract, to income that the seller expected to receive but which had not yet been received, and what
value to place on transactions in progress that had not yet closed. Under these circumstances,
Massey concluded that there must have been an oral agreement. We find no abuse its discretion in
the trial court's determination that Massey's testimony was reliable. 

Failure to Supplement Discovery Response


 Appellants also complain that Massey's opinion on the existence of an oral agreement should
have been excluded because McFadden did not disclose it. A party must disclose a testifying
expert's mental impressions and opinions and any methods used to derive them. Tex.R.Civ.P.
192.3(e)(4). A party may request disclosure of the general substance of the testifying expert's mental
impressions and opinions and a brief summary of the basis for them. Tex.R.Civ.P. 194.2(f)(3). The
Rules of Civil Procedure impose on a party an ongoing duty to supplement or amend its discovery
responses. See Tex.R. Civ. P. 193.5. Under Rule 193.6(a):

 A party who fails to make, amend, or supplement a discovery response in a timely
manner may not introduce in evidence the material or information that was not timely
disclosed, or offer the testimony of a witness (other than a named party) who was not
timely identified, unless the court finds that:


 (1) there was good cause for the failure to timely make, amend, or supplement the
discovery response; or


 (2) the failure to timely make, amend, or supplement the discovery response will not
unfairly surprise or unfairly prejudice the other parties.


Tex.R.Civ.P. 193.6(a).

 McFadden disclosed in a supplemental discovery response that Massey would testify "to the
factors, customs and practices generally involved in developing, assessing and conveying the assets
of an abstract plant, as well as his opinions as to the reasonable considerations and practical
implementation of transfer of files and accounting for premiums when an abstract plant is being
conveyed, especially as these factors apply to the facts of this case." This broad designation certainly
covered Massey's testimony regarding what he expected to see in an agreement conveying an
abstract plant. Massey expected the parties to have an agreement pertaining to outstanding
obligations of Ellyson Abstract, to income that the seller expected to receive but which had not yet
been received, and what value to place on transactions in progress that had not yet closed. Although
it was not specifically stated, Massey's conclusion that the parties had an oral agreement about these
matters falls within the disclosure. The trial court did not abuse its discretion by overruling
Appellants' objection and admitting the testimony. Issue Eight is overruled.

LIABILITY OF ELLYSON ABSTRACT


 In their final issue, Appellants complain that the trial court erred by entering judgment against
Ellyson Abstract & Title Company, L.L.C. because there was no evidence or insufficient evidence
showing that it was liable to McFadden. Appellants contend that the pleadings and evidence do not
support piercing the corporate veil. They additionally assert that Ellyson Abstract & Title Company,
L.L.C. is a limited liability company, not a limited liability corporation.

 In the original petition, McFadden named as defendants Joy B. and E. P. Adams (9) d/b/a
Ellyson Abstract & Title Co. Appellants indicated in a discovery response that "Ellyson Abstract
& Title L.L.C." is a potential party to the suit. McFadden amended the petition to include Ellyson
Abstract & Title Co., L.L.C. as a defendant. The petition alleged that Ellyson Abstract & Title Co.,
L.L.C. is a limited liability corporation licensed to do business in Texas. Contrary to Appellants'
contention on appeal that Ellyson Abstract is a limited liability company, Joy testified that Ellyson
Abstract & Title Co., L.L.C. is a limited liability corporation and she is the president and sole
stockholder. She formed the L.L.C. in 1999 prior to purchasing Ellyson Abstract from Freida. 
According to Joy, the L.L.C. owns the abstract plant and the equipment while she and her husband
personally own the building. The evidence at trial showed that the L.L.C. received the premiums
from the Stewart Title project.

 A person's status as a vice-principal of the corporation is sufficient to impute liability to the
corporation. GTE Southwest, Inc. v. Bruce, 998 S.W.2d 605, 618 (Tex. 1999); DaimlerChrysler Ins.
Co. v. Apple, 265 S.W.3d 52, 64 (Tex.App.--Houston [1st Dist.] 2008, pet. filed). Corporations can
act only through their agents. GTE Southwest, 998 S.W.2d at 618. A vice-principal represents the
corporation in its corporate capacity. Id. When actions are taken by a vice-principal of a
corporation, those acts may be deemed to be the acts of the corporation itself. Id. A vice-principal
encompasses four classes of corporate agents: (a) corporate officers; (b) those who have authority
to employ, direct, and discharge servants of the master; (c) those engaged in the performance of
nondelegable or absolute duties of the master; and (d) those to whom a master has confided the
management of the whole or a department or division of his business. Hammerly Oaks, Inc. v.
Edwards, 958 S.W.2d 387, 391 (Tex. 1997). Courts use the vice-principal doctrine to distinguish
between the acts of the corporation itself and that of a mere servant or employee. Id. Acts of a
"mere servant or employee" are the basis for corporate liability based on the doctrine of respondeat
superior. Id. The liability of the master for the negligent acts of his vice principal is placed upon
very different grounds, namely, that the negligent acts of the vice principal are the very acts of the
corporation itself. Id.

 The undisputed evidence established that Joy is a vice-principal of Ellyson Abstract & Title
Co., L.L.C , and the monies which McFadden sought to recover were received by the L.L.C. and
were not paid to Freida. Consequently, Joy's acts are the acts of the corporation. The jury's findings
are sufficient to impute liability to the L.L.C. We overrule Issue Nine.

 Having sustained Issue Seven, we reverse that portion of the judgment awarding attorneys'
fees. Finding no other error, we affirm the remainder of the judgment. We remand the cause for trial
on the sole issue of attorneys' fees. 


July 29, 2009 

 ANN CRAWFORD McCLURE, Justice


Before Chew, C.J., McClure, and Carr, JJ.

Carr, J., not participating
1. The opinion will refer to the appellants collectively as "Appellants" and to Joy Adams by her first name. 
Likewise, we will refer to the appellee as "McFadden" and to the individuals, Freida McFadden and Bruce McFadden,
by their first names.
2. The record before us does not reflect whether the trial court ruled on the motion for summary judgment. 
3. Illegality is an affirmative defense. Tex.R.Civ.P. 94. 
4. Section 2502.051 of the Texas Insurance Code provides that "[a] commission, rebate, discount, portion of
a title insurance premium, or other thing of value may not be directly or indirectly paid, allowed, or permitted by a person
engaged in the business of title insurance or received or accepted by a person for engaging in the business of title
insurance or for soliciting or referring title insurance business." Tex.Ins.Code Ann. § 2502.051 (Vernon 2009).
5. Section 2502.051 does not prohibit: (1) payment for services actually performed by a title insurance
company, title insurance agent, or direct operation in connection with title examination or with closing the transaction
or furnishing title evidence if: (A) the payment does not exceed the percentage of premium or other amount established
by the commissioner for the payment; and (B) the person receiving the payment is licensed as provided by this title. 
Tex.Ins.Code Ann. § 2502.053(1)(Vernon 2009).
6. In their reply brief, Appellants contend the trial court failed to submit separate damages questions for each
cause of action. Citing Harris County v. Smith, 96 S.W.3d 230 (Tex. 2002), Appellants argue that the error is harmful
because the single broad-form damages question included both valid and invalid measures of damages. Appellants did
not raise these arguments in their initial brief but instead restricted their complaint to the absence of an instruction on
the proper measure of damages. The Rules of Appellate Procedure do not allow an appellant to include in a reply brief
a new issue not raised by its original brief. Tex.R.App.P. 38.3. Accordingly, we will not address the arguments raised
for the first time in the reply brief. See Few v. Few, 271 S.W.3d 341, 346-47 (Tex.App.--El Paso 2008, pet. struck)(issue
raised for the first time in reply brief was not preserved for appeal); Gray v. Woodville Health Care Center, 225 S.W.3d
613, 620 (Tex.App.--El Paso 2006, pet. denied)(issue raised for the first time in reply brief was not preserved for appeal).
7. Rule 278 provides: "Failure to submit a definition or instruction shall not be deemed a ground for reversal
of the judgment unless a substantially correct definition or instruction has been requested in writing and tendered by the
party complaining of the judgment."
8. Prior to the Supreme Court's decision in Tony Gullo Motors, the exception applied when two or more claims
were dependent upon the same set of facts or circumstances and thus were intertwined to the point of being inseparable. 
See Tony Gullo Motors, 212 S.W.3d at 311 (discussing exception created by Stewart Title Guaranty Company v. 
Sterling, 822 S.W.2d 1, 11-12 (Tex. 1991). Courts referred to the claims as being "inextricably intertwined" and fee
segregation was not required. See Tony Gullo Motors, 212 S.W.3d at 311. Noting that the exception threatened to
swallow the rule, the Supreme Court eliminated this formulation of the exception. Id., 212 S.W.3d at 312-13.
9. The claims against E. P. Adams were dismissed.