

# IN THE
# TENTH COURT OF APPEALS

_____

## No. 10-12-00062-CV

**KERRY HALIBURTON, MABREE HALIBURTON**
**AND TAYLOR HALIBURTON,**

                                                          **Appellants**

 **v.**

**NANCY GILMORE AND LINDSEY HENDRICKS,**

                                                        **Appellees**

_____

### From the 12th District Court
### Madison County, Texas
### Trial Court No. 10-12376-012-10

---

## MEMORANDUM OPINION

---

This appeal involves a dispute over the ownership of three Beefmaster cattle—Clara's Jade, Hope's Cracker Jack, and Clara Belle. Appellants Kerry Haliburton and his daughters Mabree and Taylor Haliburton appeal the final judgment, entered after a bench trial, in favor of Appellees Nancy Gilmore and her daughter Lindsey Gilmore Hendricks (the Gilmores). We will reverse and remand.

**Background**

The Haliburtons met the Gilmores in 2006 through livestock shows. Taylor and Mabree had been involved in showing horses but were interested in showing cattle. The Gilmores operate the Gilmore Ranch where they breed Beefmaster cattle. Kerry noticed that the cattle with Gilmore cattle genetics were winning at the livestock shows; therefore, the Haliburtons contacted the Gilmores about buying some cattle from them.

In 2010 at the Junior Beefmaster Breeders Association (JBBA) livestock show, the Haliburtons won the national championship for the third year in a row. But after the show, Kerry was informed that a protest had been filed. That night at the banquet recognizing the champions, Kerry approached the officials and asked them who had filed the protest. The officials told him that it was confidential. Kerry then confronted Nancy. Kerry stated that he had been surprised when, either earlier that day or the day before, Nancy had told another competitor that the only reason the Haliburtons win is because they cheat and because they had influence over the judge of the national show.[1] Kerry also said that after the Haliburtons had won the national championship, he invited Nancy to join them in the picture, as he had done every time they had won, but Nancy refused, which he also thought was "bizarre." Kerry asked Nancy if she had anything to do with the protest. Nancy denied having anything to do with it and identified someone else as having filed the protest. Nevertheless, the next morning, Kerry demanded that the Gilmores return Clara's Jade, Hope's Cracker Jack, and Clara

---

[1] The Gilmores deny that Nancy made such a statement.

Belle, all three of which had been at the Gilmores' ranch. The Gilmores refused to return the cattle.[2]

The Gilmores sued the Haliburtons, seeking a declaratory judgment that the Gilmores owned the cattle and that the Haliburtons' demand for return of the cattle was an act of bad faith. The Gilmores also alleged causes of action for breach of contract, common-law fraud, and intentional infliction of emotional distress and sought the recovery of actual damages, punitive damages, and attorney's fees. The Haliburtons answered by denying the allegations, affirmatively asserting the statute of frauds as a defense, and seeking findings that they actually owned and were entitled to possession of the cattle, not the Gilmores. The Haliburtons also sought the recovery of attorney's fees.

### The Haliburtons' Version of Events

Kerry testified that the first cows he bought from the Gilmores were Betty Boop and Clara's Jade—one cow for each of his daughters. The cows were $5,000 each. Clara's Jade had already been bred and was pregnant; thus, the sale/purchase also included her unborn calf. Kerry paid for the cows with one $10,000 check, dated October 15, 2006, and the Haliburtons received Certificates of Breeding reflecting the sale.[3]

---

[2] Kerry testified that three or four days after the protest was made, experts from Texas A&M examined his cattle and concluded that the allegations had no merit.

[3] When asked if the previous testimony explained the entirety of his agreement with the Gilmores with respect to Clara's Jade, Kerry replied that the only other thing that the Haliburtons had discussed generally with the Gilmores was that if the Haliburtons chose to have any of the cattle "flushed," and the flushing resulted in the recovery of more eggs than the Haliburtons could handle, then the Haliburtons would split the extra eggs with the Gilmores in return for the Gilmores splitting the cost of the breeding

Beefmaster cattle are registered with the Beefmaster Breeders United (BBU) organization. Registration and ownership of a cow is reflected by a Certificate of Breeding. Kerry explained that registration with the BBU is like the registration of a car. When a registered Beefmaster cow is sold, ownership of the cow is assigned to the new owner and reflected by completing the transfer form on the back of the Certificate of Breeding. The transfer form provides, "When the ownership of the animal named on this Certificate changes, the **Seller** must immediately complete the transfer and return the Certificate to Beefmaster Breeders United." The form then states, "I/We hereby authorize the transfer of this Certificate of Breeding on the records of Beefmaster Breeders United to the buyer indicated below," under which the "Seller," who must be the current registered owner, identifies himself or herself, the "Buyer," and the "Date of Sale" and then signs the form. Once the transfer form has been completed, the Certificate is then submitted to the BBU, after which the BBU issues a new Certificate of Breeding listing the "Buyer" on the previous Certificate's transfer form as the new "Current Owner."

The original Certificate of Breeding for Clara's Jade, showing Lindsey as the registered owner, was admitted into evidence. The transfer form on the back of the Certificate reflects the transfer of Clara's Jade from Lindsey, the "Seller," to Mabree, the "Buyer" on October 15, 2006, the "Date of Sale," and Lindsey signed the form. The current Certificate of Breeding for Clara's Jade was also admitted into evidence.

services. "Flushing" is a process by which eggs from a cow with superior genetics are harvested to produce embryos. The embryos are then placed in recipient cows, allowing for the breeding of multiple cattle with the donor cow's superior genetics. Nancy's husband is certified to perform artificial insemination services.

Sometime after Lindsey's transfer of Clara's Jade to Mabree, Mabree transferred fifty percent ownership of Clara's Jade to Taylor; therefore, the current Certificate of Breeding lists the "Breeder-Member-First Owner" of Clara's Jade as Lindsey and the "Current Owner" as fifty percent Mabree and fifty percent Taylor. The Certificates of Breeding and the check by which Kerry paid the Gilmores were the only writings between the parties related to the sale/purchase of Clara's Jade.

After Betty Boop and Clara's Jade, the Haliburtons then purchased Felicity's Lucy on March 1, 2007 for $5,000 and Hope's Cracker Jack on June 20, 2007 for $6,000. A BBU "BILL OF SALE" for Hope's Cracker Jack was admitted into evidence. It states that Lindsey, the "Seller," "sold" Hope's Cracker Jack to Taylor, the "Buyer," on June 20, 2007, the "Date of Sale," and Lindsey signed the form. The current Certificate of Breeding for Hope's Cracker Jack was also admitted into evidence. It lists the "Breeder-Member-First Owner" of Hope's Cracker Jack as Lindsey and the "Current Owner" of Hope's Cracker Jack as Taylor. The Bill of Sale and the Certificate of Breeding were the only writings between the parties related to the sale/purchase of Hope's Cracker Jack.

After Hope's Cracker Jack, the Haliburtons then purchased Fritzi's Angelina on September 1, 2007 for $5,000 and Clara Belle on February 5, 2008 for $6,000. The original Certificate of Breeding for Clara Belle, showing Lindsey as the registered owner, was admitted into evidence. The transfer form on the back of the Certificate reflects the transfer of Clara Belle from Lindsey, the "Seller," to Taylor, the "Buyer," on February 5, 2008, the "Date of Sale," and Lindsey signed the form. The current Certificate of Breeding for Clara Belle was also admitted into evidence, listing Lindsey

as the "Breeder-Member-First Owner" and Taylor as the "Current Owner." These Certificates of Breeding were the only writings between the parties related to the sale/purchase of Clara Belle.

After Clara Belle, the only other show heifers that the Haliburtons purchased from the Gilmores were Hope's Pepper Jack on March 15, 2008 for $6,000 and Clara Kate's Bliss on January 2, 2009 for $6,000.[4] At one time the Haliburtons also had an arrangement with the Gilmores regarding a cow named Clara's Kate, but the Haliburtons never purchased her. In fact, the Gilmores received no compensation for the arrangement, which was as follows: Lindsey had shown Clara's Kate, but once Lindsey had gotten beyond the age to show her, the Gilmores allowed Mabree to show her for a few months. In doing this, the Gilmores transferred the Certificate of Breeding for Clara's Kate to Mabree in the same manner as they had done with the other cattle that the Haliburtons had purchased. Kerry stated that his understanding was that a person had to be one of the listed owners to be able to show the animal. When the Haliburtons had finished showing Clara's Kate, they then transferred the Certificate of Breeding back to the Gilmores. The purchase of Clara Kate's calf, Clara Kate's Bliss, had nothing to do with the arrangement.

Besides purchasing cattle from the Gilmores, the Haliburtons also sent their cattle to the Gilmores from time to time for breeding services, after which the cattle would be returned to the Haliburtons. The cattle sent to the Gilmores included Clara's Jade, Hope's Cracker Jack, and Clara Belle, as well as other cattle the Haliburtons had

---

[4] Besides show heifers, Kerry testified that he had also purchased at least one bull from the Gilmores.

purchased from the Gilmores and even some cattle that the Haliburtons had not purchased from the Gilmores. Clara's Jade, Hope's Cracker Jack, and Clara Belle just happened to be at the Gilmores' ranch for breeding services when Kerry demanded their return.

Clara's Jade had been at the Gilmores for approximately two years when Kerry demanded her return. She had been at the Gilmores for that amount of time because her eligibility to be shown had been over for some time and thus her value was in repetitive flushing. Also, Clara's Jade was injured at some point during the process of being artificially inseminated, and there was a long recovery time before they could attempt to breed her again. Hope's Cracker Jack and Clara Belle had been at the Gilmores since either 2009 or 2010 when Kerry demanded their return. Hope's Cracker Jack's eligibility to be shown had ended by that time, but Clara Belle was still eligible to be shown.

Kerry did not return any of the Certificates of Breeding with the cattle when they were sent to the Gilmores for breeding services. Taylor testified that she did have her mother send Mr. Gilmore the Certificate of Breeding for Hope's Cracker Jack, but she did not sign the transfer form on the back of the Certificate. Mr. Gilmore had told Taylor that the original Certificate of Breeding for Hope's Cracker Jack was needed for her first flush.

Kerry ultimately testified that in all his discussions with the Gilmores, he never discussed leasing or borrowing Clara's Jade, Hope's Cracker Jack, or Clara Belle from the Gilmores and then transferring ownership of the cattle back to them. Before the

date when he demanded the cattle back from the Gilmores, the Gilmores had never told him that they expected the cattle to be transferred back into the Gilmores' name. Furthermore, he never promised Nancy that he would draft a separate contract concerning his purchases of Clara's Jade, Hope's Cracker Jack, and Clara Belle.[5]

### The Gilmores' Version of Events

Nancy testified that in October 2006, the Haliburtons purchased Betty Boop for $5,000 and expressed an interest in purchasing Clara's Jade but that the Gilmores did not want to sell her. Clara's Jade was about two years old at the time and ready to have a calf. She was also the first black-coated daughter of Clara, the Gilmores' donor cow that had produced all the champions, and black-coated Beefmaster cattle were rarer than red-coated ones at that time.

The Gilmores nevertheless reached an agreement with the Haliburtons regarding Clara's Jade, and notes regarding this agreement were recorded in a document maintained by Nancy and her husband in the normal course of their cattle-raising business. The Gilmores sold twenty-five percent ownership in Clara's Jade and one hundred percent ownership in her calf to the Haliburtons for $5,000. Even though the Gilmores retained a majority interest in Clara's Jade, Nancy said they transferred the Certificate of Breeding into Mabree's name so that she could show Clara's Jade at JBBA

---

[5] On cross-examination, Nancy did admit that the Gilmores reported the transfer of Clara's Jade, Hope's Cracker Jack, and Clara Belle to the Haliburtons as sales on their tax returns just as they did when the Haliburtons purchased other cattle from the Gilmores. The Gilmore Ranch also maintains a website for which Nancy's company controls the content. On the website is a list of at least some of the cattle that the Gilmores have sold. The list includes: in February 2008, congratulations to Taylor on the purchase of Clara Belle; in August 2007, congratulations to Mabree on the purchase of Angelina; in August 2007, congratulations to Taylor on the purchase of Hope's Cracker Jack; in March 2007, congratulations to Taylor on the purchase of Felicity's Lucy; and in October 2006, congratulations to Mabree on the purchase of Clara's Jade. The transaction for Clara's Kate was not included on the website.

and other heifer shows.[6]  The Haliburtons were then to return Clara's Jade to the Gilmores at the end of her show career.  Once Clara's Jade was returned, the Haliburtons would then receive a twenty-five percent ownership interest in any of her resulting embryos or calves, as well as be responsible for twenty-five percent of her future costs.

Nancy said that Kerry was supposed to draft a contract memorializing the agreement, but he never did.  In January 2007, Nancy received an email from Kerry's wife confirming that he was working on the contract.  The email read in pertinent part, "Kerry has been out of town all week but will get to the contract as soon as possible."  After the email, the Gilmores were told several more times that Kerry was going to get them a contract, but it never happened.  Nancy was not more forceful in insisting upon a contract from the Haliburtons because they were friends, even "like family" by June 2007.

Nancy testified that Clara's Jade was returned to the Gilmores in June 2008 as her show career was over.  The Haliburtons and Gilmores had not originally negotiated in whose name Clara's Jade would be registered after she was returned to the Gilmores, but when Clara's Jade was returned, the Haliburtons asked if the Gilmores would leave Clara's Jade registered in the Haliburtons' name so that they would be able to show her future calves in a "bred and owned show."  The Gilmores agreed, and Clara's Jade remained in the Haliburtons' name.

---

[6] Nancy testified that one cannot show an animal in a JBBA event unless that animal is registered in the person's name.  Nancy also stated that it is common for someone to register an animal in another person's name so that the other person can show the animal and then the animal is returned to the original owner.

According to Nancy, the Haliburtons and Gilmores made agreements similar to that with Clara's Jade with three other heifers because the heifers were considered "super heifers or daughters of Clara." But like with Clara's Jade, Kerry never reduced the entire agreements to written contracts.

Hope's Cracker Jack was the second cow that the Gilmores agreed to transfer to the Haliburtons until the end of her show career, at which time the Haliburtons were to return her to the Gilmores. The agreement also included that the Haliburtons would get one of Cracker Jack's natural calves and twelve embryos. Notes of the agreement were again recorded in a document maintained by Nancy and her husband in the normal course of their cattle-raising business.

Hope's Cracker Jack was returned in December 2009, her show career being over at that time. The Gilmores requested that the Haliburtons sign the Certificate of Breeding back over to them after Cracker Jack's return, but the Haliburtons forgot to bring the Certificate of Breeding when they returned her. The Gilmores did eventually receive it in the mail, but the Haliburtons had forgotten to sign the transfer form on the back, according to Nancy.

Nancy said that Clara Belle was also transferred to the Haliburtons under the same terms as the transfer of Hope's Cracker Jack. Notes of the agreement were again recorded in a document maintained by Nancy and her husband in the normal course of their cattle-raising business. Clara Belle was returned to the Gilmores in May 2010. Her show career was not over, but when the Haliburtons asked for the three cattle, Nancy

did not inquire as to whether the cow still had eligibility. Clara Belle's Certificate of Breeding was not returned when she was returned.

Finally, in December 2008, the Gilmores transferred Clara's Kate to the Haliburtons. The Certificate of Breeding was transferred into one of the Haliburton's names. She was ready to calf at that time. Nancy said that the agreement was that for $5,000 or $6,000, the Haliburtons could show Clara's Kate in the major livestock shows, keep her calf, and then bring Clara's Kate back. There was no embryo deal. Clara's Kate was returned in July 2009. The Haliburtons also returned the Certificate of Breeding with the transfer form executed on the back. The current Certificate of Breeding shows Gilmore Ranch as the owner of Clara's Kate.

Nancy acknowledged that the Gilmores also performed breeding services for the Haliburtons. When asked how long it takes for a cow to be flushed, Nancy replied that the cow is given drugs for about two weeks and then the actual flush takes about a month to a month and a half. Nancy stated that when it is time for cattle that are owned by someone else, or currently being borrowed by someone else, to be bred, the cattle are brought to the Gilmores for approximately thirty days and then returned to the respective owner or borrower. Nancy did not recall it being Clara's Jade that was injured during the breeding process; nevertheless, she stated that the injured cow was taken to Texas A&M for examination after the injury, the cow was returned, and the cow was being bred again within about a month and a half to two months after that.

The Gilmores flushed Hope's Cracker Jack in May 2010 and again in July 2010. The flushing resulted in three embryos. The Gilmores had cows available to receive the

embryos, but the Haliburtons had only one cow that could receive an embryo. The Gilmores thus took two of the embryos and the Haliburtons took one. Cracker Jack was still in the Haliburtons' name when the flushes were done, so the embryos would have been in their name as well. Kerry's wife transferred the embryos to the Gilmores by a bill of sale, but the Gilmores did not pay the Haliburtons any money at that time. Nancy was unaware of any other method that the embryos could have been transferred to them other than by bill of sale.

Nancy testified that before July 2010, the Haliburtons never made any request that possession of the three cattle be returned to them after the cattle had been returned to the Gilmores after the end of their show careers.

### The Trial Court's Ruling

The trial court ordered that the Gilmores are the owners of Clara's Jade, Hope's Cracker Jack, and Clara Belle, that the Haliburtons are divested of any and all interests in the cattle, that the Haliburtons are to execute any and all documents, including but not limited to Beefmaster Breeders United Certificates of Breeding and Transfer, transferring legal title of the cattle to the Gilmores within ten days from the date of the judgment, and that the Gilmores recover from the Haliburtons reasonable and necessary attorney's fees in the amount of $10,000. The trial court also made findings of fact and conclusions of law as follows:

#### FINDINGS OF FACT

1.      Plaintiffs and Defendants entered into an oral agreement whereby Plaintiffs would transfer Beefmaster Breeders United Certificates of Breeding ("Certificates") to three (3) registered Beefmaster cattle (the

"Cattle") and the Cattle to Defendants to enable Defendants to exhibit the Cattle in Junior Beefmaster Breeders Association sanctioned shows (the "Shows").

2. As part of the agreement, Defendants were to receive or did receive ownership of the first born calf of each of the Cattle to exhibit along side the Cattle in the Shows and a certain number of embryos from flushes of the Cattle.

3. At the end of their show careers, the Cattle were to be returned to Plaintiffs and the Cattle were to be re-registered in Plaintiffs' names.

4. The Cattle were returned to Plaintiffs and are currently in Plaintiffs' possession.

5. Defendants retained ownership and possession of the calves and received embryos as agreed by the parties.

6. Defendants did not re-register the Cattle in Plaintiffs' names as agreed.

7. Defendant, Kerry Haliburton is an attorney licensed to practice law in the State of Texas.

8. Defendant, Kerry Haliburton agreed to reduce the parties' agreement to writing, [b]ut failed to do so.

9. Plaintiffs relied on the representations made by Defendant Kerry Haliburton.

10. The representations made by Defendant Kerry Haliburton were material and were false.

11. Plaintiffs relied on the representations made by Defendant Kerry Haliburton to their detriment.

12. Plaintiffs suffered damages as a result of the false representations made by Defendant Kerry Haliburton.

13. Plaintiffs incurred reasonable and necessary attorney's fees of $10,000.00 in prosecuting their claim.

14.     The agreement between Plaintiffs and Defendants could be performed within one (1) year.


## *CONCLUSIONS OF LAW*

15.     A valid enforceable contract existed between Plaintiffs and Defendants.

16.     Defendants breached the contract.

17.     The statute of frauds does not apply to the contract between Plaintiffs and Defendants.

18.     The transfer of the Cattle to Defendants and the agreed upon return of the Cattle to Plaintiffs was not a "sale" within the meaning of the Texas Uniform Commercial Code.

19.     The Certificates do not constitute the written agreement between the parties.

20.     The oral agreement between the parties constitutes a[] contemporaneous and collateral agreement that would naturally and normally be included in a separate agreement apart from the Certificates.

21.     The Parol[] Evidence Rule does not prevent the introduction of intrinsic evidence regarding the Certificates or any other part of the agreement between the parties.

22.     Plaintiffs are the owners of the Cattle and are entitled to immediate possession and ownership of the Cattle.

23.     Defendants have a legal obligation to re-register the Cattle in Plaintiffs' names.

24.     Plaintiffs are entitled to receive reasonable and necessary attorney's fees of $10,000.00 from Defendants.

This appeal ensued.

## Standard of Review

Findings of fact entered in a case tried to the court have the same force and dignity as a jury verdict. *Anderson v. City of Seven Points*, 806 S.W.2d 791, 794 (Tex. 1991). We thus review findings of fact by the same standards that are applied in reviewing the legal and factual sufficiency of the evidence supporting a jury's answer to a jury question. *Id.*

The test for legal sufficiency is "whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review." *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). In making this determination, we credit favorable evidence if a reasonable fact-finder could and disregard contrary evidence unless a reasonable fact-finder could not. *Id.* So long as the evidence falls within the zone of reasonable disagreement, we may not substitute our judgment for that of the fact-finder. *Id.* at 822. The trier of fact is the sole judge of the credibility of the witnesses and the weight to give their testimony. *See id.* at 819. Although we consider the evidence in the light most favorable to the challenged findings, indulging every reasonable inference that supports them, we may not disregard evidence that allows only one inference. *Id.* at 822.

When considering a factual sufficiency challenge, we consider all the evidence supporting and contradicting the finding. *Plas-Tex, Inc. v. U.S. Steel Corp.*, 772 S.W.2d 442, 445 (Tex. 1989). We set aside the finding only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *See Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986).

The standard of review for conclusions of law is de novo. *See BMC Software Belg.,
N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002). We evaluate the trial court's legal
conclusions independently to determine whether the trial court correctly drew the legal
conclusions from the facts. *Id.* We uphold conclusions of law on appeal if the judgment
can be sustained on any legal theory the evidence supports. *Material P'ships, Inc. v.
Ventura*, 102 S.W.3d 252, 257 (Tex. App.—Houston [14th Dist.] 2003, pet. denied). Thus,
incorrect conclusions of law do not require reversal if the controlling findings of fact
support the judgment under a correct legal theory. *Id.*

**Discussion**

In their first issue, the Haliburtons contend that the trial court erred in admitting
parol evidence to alter the terms of the Bill of Sale and Certificates of Breeding. The
Haliburtons argue that the parol evidence rule applies because the Bill of Sale and
Certificates of Breeding are writings that reflect the parties' agreement as to the cattle in
question. The Gilmores respond that the parol evidence rule does not apply because
the documents are only part of the agreement of the parties and not integrations of the
entire agreement. We agree with the Haliburtons that the parol evidence rule applies in
this case.

Texas Business and Commerce Code section 2.202, the parol evidence rule
applicable to the sale of goods,[7] provides:

---

[7] The Gilmores describe the transactions regarding Clara's Jade, Hope's Cracker Jack, and Clara Belle as
more of a sale that functions as a lease than an outright sale. Thus, although the Gilmores cite section
2.202 as authority in this case, we note that section 2A.202, the parol evidence rule applicable to the lease
of goods, is virtually identical to section 2.202. *See* TEX. BUS. & COM. CODE ANN. § 2A.202 (West 2009).

> Terms with respect to which the confirmatory memoranda of the parties agree or which are otherwise set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement but may be explained or supplemented (1) by course of performance, course of dealing, or usage of trade (Section 1.303); and (2) by evidence of consistent additional terms unless the court finds the writing to have been intended also as a complete and exclusive statement of the terms of the agreement.

TEX. BUS. & COM. CODE ANN. § 2.202 (West 2009); *see id.* § 2.102 (West 2009). In determining whether this rule is applicable, the first question is whether the Bill of Sale and Certificates of Breeding constitute "confirmatory memoranda" containing terms upon which the parties agree or "writing[s] intended by the parties as a final expression of their agreement with respect to such terms as are included therein" (*i.e.*, integrated agreements). *See id.* § 2.202; *Morgan Bldgs. & Spas, Inc. v. Humane Soc'y of Southeast Tex.*, 249 S.W.3d 480, 486 (Tex. App.—Beaumont 2008, no pet.). A fully integrated written agreement is a final and complete expression of all the terms agreed upon by the parties. *Morgan Bldgs. & Spas*, 249 S.W.3d at 486. A partially integrated agreement is a final and complete expression of all the terms addressed in that written agreement, but is not a final and complete expression of all the terms the parties have agreed upon. *Id.* A court considers the surrounding circumstances in determining whether, and to what degree, an agreement is integrated. *Id.* (citing *Sun Oil Co. v. Madeley*, 626 S.W.2d 726, 731-32 (Tex. 1981)).

The Bill of Sale and Certificates of Breeding are not fully integrated written agreements. For instance, neither the Bill of Sale nor the Certificates of Breeding include the price for the cattle, and both parties seem to acknowledge that there was some

agreement regarding breeding services that was not included in the Bill of Sale or Certificates of Breeding. But the analysis does not end there. Although neither the Bill of Sale nor the Certificates of Breeding include *all* the terms agreed upon by the parties, both the Haliburtons and the Gilmores agree that the Bill of Sale and the Certificates of Breeding are writings that reflect at least part of their agreement. And the documents themselves as well as the parties' testimony establish that the Bill of Sale and Certificates of Breeding were the final expression of the terms of the agreement included in those documents. Nancy specifically testified that a bill of sale or certificate of breeding is a sufficient contract that transfers the rights to a cow. Therefore, the Bill of Sale and Certificates of Breeding are "confirmatory memoranda" containing terms upon which the parties agree or "writing[s] intended by the parties as a final expression of their agreement with respect to such terms as are included therein."

The Gilmores nevertheless argue that the parol evidence rule does not apply in this case because exceptions to the rule apply. The Haliburtons disagree and also challenge such findings of fact and conclusions of law.

The Gilmores first argue that they were properly allowed to introduce evidence that the Haliburtons agreed to reconvey the cattle to them and failed to do so because parol evidence is allowed to show the failure or lack of consideration. Parol evidence is allowed to show the failure or lack of consideration, *see DeLuca v. Munzel*, 673 S.W.2d 373, 376 (Tex. App.—Houston [1st Dist.] 1984, writ ref'd n.r.e.), but the evidence that the Gilmores introduced was not evidence of failure or lack of consideration. The Gilmores did not contest that the Haliburtons paid them $5,000 in the transaction regarding

Clara's Jade, $6,000 in the transaction regarding Hope's Cracker Jack, and $6,000 in the transaction regarding Clara Belle. Instead, the Gilmores introduced evidence that their own promise in exchange for the Haliburtons' money was not an outright sale of the cattle but rather a sale that actually functioned as a lease. Thus, this exception to the parol evidence rule does not apply.

The Gilmores next argue that the oral agreement to reconvey the cattle to them is a contemporaneous collateral agreement, as stated in the trial court's conclusions of law (No. 20). The Supreme Court recently explained this exception:

> The general rule for an unambiguous contract is that evidence of prior or contemporaneous agreements is inadmissible as parol evidence. *David J. Sacks, P.C. v. Haden*, 266 S.W.3d 447, 450 (Tex. 2008) (per curiam). However, an exception exists for consistent collateral agreements. As we stated over half a century ago in *Hubacek v. Ennis State Bank*, the parol evidence rule "does not preclude enforcement of prior or contemporaneous agreements which are collateral to an integrated agreement and which are not inconsistent with and do not vary or contradict the express or implied terms or obligations thereof." 159 Tex. 166, 317 S.W.2d 30, 32 (1958); *accord Haden*, 266 S.W.3d at 451 ("Under the exception, parol evidence can be used to demonstrate a prior or contemporaneous agreement that is both collateral to and consistent with a binding agreement, and that does not vary or contradict the agreement's express or implied terms or obligations."). A collateral agreement between parties concerning the relationship of several distinct obligations between them falls within the exception. *See, e.g.*, *Hubacek*, 317 S.W.2d at 34 ("A and B in an integrated contract respectively promise to sell and to buy Blackacre for $3,000.00. A contemporaneous oral agreement between them that the price shall be paid partly by discharge of a judgment which B has against A is operative." (quoting with approval RESTATEMENT (FIRST) OF CONTRACTS section 240 cmt. d (1939))).

*ERI Consulting Eng'rs, Inc. v. Swinnea*, 318 S.W.3d 867, 875-76 (Tex. 2010).

Here, the evidence of an oral agreement to reconvey the subject cattle to the Gilmores is not consistent with the Bill of Sale and Certificates of Breeding. The Bill of

Sale and Certificates of Breeding unambiguously show that Lindsey *sold* the subject cattle to Taylor and Mabree. Evidence of an oral agreement to reconvey the subject cattle to the Gilmores at the end of their show careers contradicts that the transactions were sales and instead indicates that the transactions were more like leases. Thus, the consistent-collateral-agreement exception to the parol evidence rule does not apply in this case.

The Gilmores next argue that although there is no "intrinsic evidence exception" to the parol evidence rule, it is true that the parol evidence rule does not prevent the admission of intrinsic evidence as to the Certificates or other agreements of the parties, as stated in the trial court's conclusions of law (No. 21). The Gilmores argue that the trial court's "intrinsic evidence" conclusion simply means that the parol evidence rule does not apply because the Bill of Sale and Certificates of Breeding were not integrated agreements setting forth the entire agreement of the parties and that evidence of an oral agreement to reconvey the subject cattle to the Gilmores at the end of the cattle's show career is thus admissible because it does not contradict or vary the terms of the Bill of Sale or Certificates of Breeding. But, as just explained, the parol evidence that the transactions were more like leases contradicts the unambiguous language of the Bill of Sale and Certificates of Breeding showing that Lindsey sold the subject cattle to Taylor and Mabree.

Having found no caselaw setting forth an "intrinsic evidence" exception to the parol evidence rule, the Haliburtons theorize that the trial court's "intrinsic evidence" conclusion of law meant that it found the Bill of Sale and Certificates of Breeding to be

ambiguous and that parol evidence (*i.e.*, "intrinsic evidence") could thus be considered to resolve the ambiguity and explain the meaning of the written instruments. But, as the Haliburtons go on to explain, the trial court's conclusion of law cannot be upheld even under this interpretation. The Bill of Sale and Certificates of Breeding are unambiguous. They show that Lindsey sold the subject cattle to Taylor and Mabree. The parol evidence that the transactions were more like leases would not then resolve an ambiguity but create one, and parol evidence is not admissible for the purpose of creating an ambiguity. *Kelley-Coppedge, Inc. v. Highlands Ins. Co.*, 980 S.W.2d 462, 464 (Tex. 1998).

Finally, the Gilmores state in their brief that although they pled common-law fraud, at no time have they contended that the Haliburtons' alleged fraud was an exception to the parol evidence rule. Nevertheless, the parol evidence rule does not bar extrinsic evidence that the defendant procured the contract by fraud. *See DRC Parts & Accessories, L.L.C. v. VM Motori, S.P.A.*, 112 S.W.3d 854, 864 (Tex. App.—Houston [14th Dist.] 2003, pet. denied). And the trial court made several findings of fact in favor of the Gilmores on their fraud claim. The Haliburtons contend that the trial court's fraud findings are not an exception to the parol evidence rule.

The Gilmores alleged, and the trial court found that the Haliburtons orally agreed to return the subject cattle to the Gilmores and to re-register the cattle in the Gilmores' name. The trial court also found that Kerry, a licensed attorney, agreed to reduce the parties' oral agreement to writing but failed to do so and that the Gilmores relied on this representation to their detriment.

An essential element of a fraud claim is that the plaintiff actually and *justifiably* relied on the defendant's misrepresentation to suffer injury. *Id.* at 858; *TCA Bldg. Co. v. Entech, Inc.*, 86 S.W.3d 667, 674 (Tex. App.—Austin 2002, no pet.). A party to an arm's length transaction must exercise ordinary care and reasonable diligence for the protection of his own interests, and failure to do so is not excused by mere confidence in the honesty and integrity of the other party. *DRC Parts & Accessories*, 112 S.W.3d at 864. Therefore, reliance upon an oral representation that is directly contradicted by the express, unambiguous terms of a written agreement between the parties is not justified as a matter of law. *Id.*

Even if we accept as true that the Haliburtons made the alleged misrepresentations stated above, we cannot conclude that the Gilmores justifiably relied on them to their detriment. We reiterate that the Bill of Sale and Certificates of Breeding unambiguously show that Lindsey sold the subject cattle to Taylor and Mabree and that an oral agreement that the transactions were to function more like leases than sales would thus directly contradict the Bill of Sale and Certificates of Breeding. The Gilmores' reliance on such a representation is therefore not justified as a matter of law. *See id.* For the same reason, reliance on a representation by Kerry to reduce an oral agreement that directly contradicts the Bill of Sale and Certificates of Breeding to writing is not justified as a matter of law. *See id.*

Nancy did testify that the Haliburtons were "like family" to the Gilmores by June 2007, indicating that the transactions were no longer being made at arm's length; however, even accepting Nancy's testimony as true, the transaction regarding Clara's

Jade was made in 2006, soon after the Gilmores and Haliburtons had met. According to Nancy, the Haliburtons orally agreed at that time to return Clara's Jade to the Gilmores at the end of her show career, and Kerry agreed to reduce this oral agreement to writing but failed to do so. Thus, even though the transactions regarding Hope's Cracker Jack and Clara Belle were in 2007 and 2008, respectively, any reliance by the Gilmores on a representation by Kerry to reduce these later agreements to writing when he never reduced the agreement regarding Clara's Jade to writing is not justified. Thus, the fraud exception to the parol evidence rule does not apply in this case.

In light of the foregoing, we conclude that the parol evidence rule applies in this case and that the trial court therefore erred in admitting evidence of the oral agreements contradicting the Bill of Sale and Certificates of Breeding. *See* TEX. BUS. & COM. CODE ANN. § 2.202. We sustain the Haliburtons' first issue. Furthermore, because the trial court clearly relied on the Gilmores' parol evidence, the Haliburtons were harmed, and we need not address their second or third issues.

The Haliburtons contend that without the parol evidence of the oral agreements contradicting the Bill of Sale and Certificates of Breeding, this case should be reversed and rendered, declaring the Haliburtons to be the owners of the cattle as reflected in the writings and awarding them their fees and costs incurred in this matter. But because the Haliburtons have not raised the issue that the evidence established their ownership of the three cows as a matter of law, we reverse the judgment and remand the case to the trial court for further proceedings consistent with this opinion.

REX D. DAVIS
Justice

Before Chief Justice Gray,
     Justice Davis, and
     Justice Scoggins
Reversed and remanded
Opinion delivered and filed May 2, 2013
[CV06]